# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
November 25, 2014 Session

# IN RE: EMMALEE O., ET AL.

**Appeal from the Circuit Court for Knox County**
**No. 126793      Jon K. Blackwood, Senior Judge**

---

**No. E2014-00261-COA-R3-JV - Filed January 27, 2015**

---

This appeal concerns an allegation of child sexual abuse against a parent. The Tennessee Department of Children's Services ("DCS") filed a petition in the Juvenile Court for Knox County ("the Juvenile Court") against Alan O. ("Father") alleging that he had sexually abused his then three year old daughter Emmalee O. ("the Child"). The Child had disclosed that Father had "poked" and "rubbed" her vagina. For his part, Father asserted that he touched the Child's vaginal area only as part of his normal parenting duties, and that he never touched her in an inappropriate manner. After a trial, the Juvenile Court found that the Child was a victim of severe child abuse by Father. The case was appealed to the Circuit Court for Knox County ("the Trial Court"). After a new trial, the Trial Court found that the Child was a victim of severe child abuse by Father. Father appeals to this Court. We hold, *inter alia*, that the evidence rises to the level of clear and convincing sufficient to establish severe child abuse. We affirm the judgment of the Trial Court in its entirety.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which JOHN W. MCCLARTY and THOMAS R. FRIERSON, II, JJ., joined.

Alan O., pro se appellant.

Robert E. Cooper, Jr., Attorney General and Reporter, and, Mary Byrd Ferrara, Assistant Attorney General, for the appellee, the Tennessee Department of Children's Services.

Patti Jane Lay, Knoxville, Tennessee, for the appellee, Trisha O.

## OPINION

## Background

Father married Trisha O. ("Mother") in August 2006. This was Mother's second marriage. Mother had two children from her prior marriage, Ashley and Conner. This was the first marriage for Father, then age fifty. Father and Mother met through an online Christian singles dating service. Father and Mother's marriage was to be "scriptural" in nature, guided by their interpretation of Christian requirements for marriage.

Father and Mother lived in Mother's house from her previous marriage. Mother operated an internet business called Mystery Shoppers, and Father worked as a software engineer at Cisco. Father later left Cisco and became a stay-at-home dad. Father and Mother had two daughters together. The first daughter, the Child, was born in September 2007, and is the child at the heart of the controversy. The parties' second daughter, Abigail, was born in August 2009.

In 2009, problems began to develop in the marriage. Father moved out of the marital residence. Father continued to visit the marital home as the parties attempted to reconcile for a period. While this was happening, Mother obtained legal services to file for a separation from Father. Father did not know that this had occurred until many months later. Father and Mother saw several counselors in a bid to fix their collapsing marriage. Nothing, however, worked. In the meantime, the parties had adopted a 50/50 visitation schedule for their children. Following further conflict in January 2011, Mother told Father he could no longer spend the night at her home.

In March 2011, Mother took the Child to see her pediatrician ("Dr. Meyer"). The Child told Mother that her father had rubbed her vaginal area. Dr. Meyer examined the Child and noticed that the Child's vagina was irritated. Dr. Meyer reported the matter to DCS. This initial report yielded no further action. Mother began talks with licensed clinical social worker Nan Buturff ("Buturff"). Mother continued to monitor the Child.

In late April 2011, the Child stayed with Father for another visitation. Afterwards, the Child told Mother that she wanted to go see Dr. Meyer, and that Father had "poked" her in her vaginal area. Mother took the Child to Dr. Meyer for another examination, which revealed irritation in the vaginal area. Mother then took the Child to see Buturff. Buturff asked the Child if anyone had touched her vagina. The Child stated that Father had. Buturff subsequently reported the matter to DCS, and these legal proceedings followed.

The Child underwent a forensic interview on April 29, 2011. Nicole Bajoie, a licensed forensic interviewer, conducted the Child's interview. The Child stated that Father had touched her vagina, or, "putty," as she called it. Mother, through law enforcement, made a recorded phone call to Father to inform him. Father angrily denied any inappropriate touching of the Child and claimed Mother only made the allegations to garner an advantage in their divorce proceedings. Law enforcement visited Father and interviewed him as well. In that interview, Father denied any inappropriate touching of the Child, but noted that about six weeks prior he had noticed some vaginal irritation on the Child.

In May 2011, DCS filed its petition for restraining order against Father in the Juvenile Court, alleging that Father had abused the Child and requesting that a guardian ad litem be appointed for the Child. In 2012, following a hearing, a Magistrate of the Juvenile Court found that the Child and Abigail were dependent and neglected and that the Child was the victim of severe child abuse by Father. Father filed a petition for rehearing with the Juvenile Court, which was denied.

The matter then went to the Trial Court for trial *de novo*. The new trial occurred over several days in December 2013. The Trial Court, whose detailed factual findings are quoted below, heard testimony regarding the disclosures of the Child. In addition to the testimony regarding these disclosures, as reflected below in the Trial Court's detailed order, we also quote from Father's testimony as to his explanation for the events in controversy. Father, when questioned about the timing of the alleged incidents and confronted with his deposition responses, testified:

Q.     Okay. I think I cut you off at, "You stay right here and let daddy go get a washcloth and I'll wipe it out." No, no, no. "I took my finger like this to open her vagina." Pick up with line 8, "and I took."

A.     "And I took that washcloth and I put it on my thumb and I went like this."

Q.     I don't remember what you did, but what did you do with your thumb and washcloth at that time?

A.     If I could recall, when we were doing this, it was I had her vagina spread and I had the washcloth on my thumb and I wiped up, because she had the discharge inside the crease on the left side of her vagina. So I wiped up to wipe that out.

\*\*\*

Q.     [Mr. O], would you agree with me that you did not provide Detective Delgado and Investigator Bishop that story of opening up Emmalee's vagina when they talked to you on April 29, 2011?

A.     No, I didn't go into that detail. I did tell them that I had checked her for a yeast infection and that I had looked for the discharge, but it was not until I got some of the records that indicated, for example, like that intake report which indicated in detail, like, for example, that Emmalee was on the sofa and she said daddy gave her a kiss and it hurt that I was able to start realizing that earlier - - because nobody told me there was a complaint in March.

       I had no idea that anybody said there was any allegations back on March 11th or the first part of March, so I didn't look back that far to try and figure out whether or not that might be what Emmalee was talking about. It was only after I got Ms. Buturff's records and the DCS records that I could see there was actually a complaint back in the first part of March, that I could say, okay, that looks like maybe what she's talking about, because up until that point, I had no reason to think that that had anything to do with it, because [Mother] told me that that alleged touching happened that last visit [in April] and that she took her to the doctor right then. It was only after I got more information and realized there was a complaint in the first part of March that any of this made any sense.

Q.     So it took your realizing that there was a complaint back in March to recall this kind of story with this kind of detail? When you were confronted on April 29 of 2011 about your child saying she had been poked and rubbed by you, it took learning about a complaint back in March to recall this story?

A.     We were not discussing what happened in March in April when they interviewed me. We were looking at the last visit. This would have been totally irrelevant, because there's no way that Emmalee would have been complaining, I didn't think, about something that happened seven weeks ago or in the first part of March, when what was told to me was, by [Mother], was whatever this allegation was happened like two days ago or three days ago when they were with me for the last time.

-4-

Now, if they had said there was a complaint also in the first part of March, can you think of anything then, then I probably would have been able to say, well, look, perhaps it was that, because the best I can determine, I checked her on March 6th, which is four days before [Mother] said that Emmalee mentioned comments to her. Like I said, the focus was on the last visit, and what happened seven weeks ago or seven months ago really didn't explain what Emmalee was supposedly saying during the last visit.

Q.     Okay. Now, this alleged yeast infection that you opened up her vagina to wipe out the discharge in March, you didn't take Emmalee to see the doctor to help her with that alleged yeast infection, correct?

A.     I did not take Emmalee to the doctor. I thought the correct treatment for a yeast infection was to give her yogurt, because that's what I had discussed with my wife on previous occasions. I had given the girls yogurt so they wouldn't get yeast infections. Emmalee told her mother that her daddy said she had a yeast infection at this same time. So, no, I didn't take her to the doctor because I didn't realize that's what I should have done, but in retrospect, I should have, because she complained that it was itching.

In January 2014, the Trial Court entered its order finding the Child to be the victim of severe child abuse. Given the fact-intensive nature of this case, the significance of the Trial Court's factual findings to our review, and, in the cause of maximum completeness given the grave subject matter at issue, we will reproduce a large portion of the Trial Court's detailed order:

While the parties were separated, but during the time that the father was visiting and spending the night at the wife's house, the mother observed an incident wherein Emmalee touched herself in a sexual manner. Emmalee placed herself close to her father on the floor, spread her legs and said "Scratch my putty, daddy." Neither party thought this incident to be of any import. After the final separation in January, the mother noticed that Emmalee would touch herself in her private parts. Emmalee would either pull her pants down and start touching or would insert her hand into her panties. Mother inquired of Emmalee if anyone touched her. Emmalee responded by saying "Daddy does." Mother asked, "What does Daddy do?" In response, Emmalee stuck her hand on her vagina and said, "rub, rub" while her hand went up and down on her vagina. While concerned about this disclosure, the mother took no

action fearing that she might have misinterpreted the situation. Several days later, she observed Emmalee repeat the same conduct while lying on the bed. Upon inquiry, Emmalee responded, "Daddy does" and "rub, rub."

After observing this incident, the mother called several of her friends and counselors for advice. One of her friends provided her with the name of a child therapist, Nan Buturff.

On March 10, 2011, Emmalee spent the day with her father and returned to her mother's home that evening. Mother was putting Emmalee to bed, when the child reached down and touched her vagina area and stated that "I guess the kiss [on the cheek] daddy gave me will make it feel better." The child further stated that her "putty" hurt and daddy had rubbed on it. The mother examined the child's vaginal area and noticed that it was very raw and red. The mother then put medication on the area and asked if Emmalee wanted to see Dr. Meyer, the child's pediatrician. The next day, mother carried her daughter to see Dr. Meyer. The mother explained her concerns to Dr. Meyer about possible sexual abuse. Dr. Meyer then interviewed [Emmalee] while conducting an exam. Dr. Meyer asked Emmalee "if anyone had touched her in her privates." Emmalee stated "Yes, my daddy rubbed me there." Dr. Meyer further inquired with what and Emmalee responded, "his hand."

Dr. Meyer's physical exam of Emmalee revealed the diaper creme in her genital area that the mother administered the night before. In the areas where the creme was not thick, Dr. Meyer could see that the vaginal area was irritated and some redness. She did not observe any tears or trauma. Dr. Meyer advised the mother to seek a full exam at Child Help and that she would be required to report her medical findings to the Department of Children's Services (DCS).

Although Dr. Meyer reported this matter to DCS, a cursory investigation determined that the report was unfounded. It should be noted that the parties were still in the process of reconciliation. Consequently, father was unaware of Dr. Meyer's report to DCS.

During March, the mother observed that Emmalee's emotional behavior changed. She seemed depressed and did not want to go to father's home. Mother decided to contact Ms. Buturff to discuss the behavior of Emmalee. On March 30, she explained to Ms. Buturff her observations and was advised to keep observing Emmalee to see if any further touching occurs.

The parties continued to follow the 50-50 visitation schedule. Emmalee stayed with her father from April 22 thru 26. After returning home, the mother noticed that Emmalee was on the couch with her legs in the air. Her pants and panties were down. Emmalee stated "I need you to take me to see Dr. Meyer. Daddy poked me." Emmalee spread her legs and put her finger in her vagina area and stated "poke, poke, poke." The mother did not notice any medication in the vaginal area. The next morning she made an appointment to see Dr. Meyer. Dr. Meyer performed a cursory physical examination which revealed mild irritation around the labia. Dr. Meyer did not take a history from Emmalee because the mother had made arrangements for Child Help and Ms. Buturff to see the child later that day. Mother then took Emmalee to Child Help. The physician at Child Help did not perform a further physical exam because Emmalee had already been examined by Dr. Meyer. Emmalee was then taken to see Ms. Buturff.

Ms. Buturff saw Emmalee that afternoon for a play therapy session. During the session, Ms. Buturff asked Emmalee if "anyone touched it." Emmalee stated "my dad does." She asked "how does he touch you." In response, Emmalee drew nearer to Ms. Buturff and stated in a very dramatic manner, "Sh. It is a secret." Ms. Buturff had Emmalee draw a figure of a girl and Emmalee pointed out the vaginal area to indicate where she had been touched. Ms. Buturff informed the mother about this disclosure and that she would be reporting the matter to the DCS. Ms. Buturff's report was the genesis of this investigation and the legal proceedings in Juvenile Court.

After the report, a DCS investigator along with a law enforcement official met with the mother and obtained a statement from her. A forensic interview was then arranged for Emmalee on April 29, 2011. Nicole Bajoie, a licensed forensic interviewer conducted Emmalee's interview. Emmalee told Ms. Bajoie that her dad tried to touch her butt and she said "No, don't touch it. And he just got mad." Emmalee further relates that father was going to touch her with his hand. The following exchange also occurred:

INTERVIEWER: Okay. Where were you when he tried to touch your putty?

EMMALEE: Um, like in the bedroom.

INTERVIEWER: In the bedroom? Were you on the bed then or were you somewhere else in the room?

EMMALEE: I was on the bed.

INTERVIEWER: You were on the bed?

EMMALEE: When he touched the putty.

INTERVIEWER: And then he did touch the putty?

EMMALEE: Um-hum.

INTERVIEWER: What did it feel like when he touched the putty?

EMMALEE: Um, Poke!

INTERVIEWER: Poke?

EMMALEE: And then Rub!

INTERVIEWER: And then poke and rub?

EMMALEE: Um-hum.  Then Poke!

INTERVIEWER: What was he poking it with?

EMMALEE: Rub!

INTERVIEWER: What was he poking it with?

EMMALEE: Um, his finger.

INTERVIEWER: His finger?  One finger or more than one finger?

EMMALEE: Um, one finger.

After the taped forensic interview, the law enforcement official arranged for the wife to make a telephone call to the father. The wife revealed to the father that Emmalee had made disclosures that indicated he had touched her inappropriately. The father was unaware that the call was being recorded. Finally, a statement was taken from the father later that day.

<u>Credibility of Emmalee's Disclosures</u>

It was uncontradicted that Emmalee made the statements attributed to her by the wife, Dr. Meyer and Nan Buturff. The issue before the Court is whether these disclosures reflect actual incidences of inappropriate contact by the father or are the product of suggestion, or of innocent lying, parental misinterpretation or confusion.

Dr. William S. Bernet, a forensic psychiatrist, testified on behalf of the father. He opined that Emmalee was not subjected to child abuse by her father and posited several opinions to support his position. He discussed the concept of innocent lying, which occurs when the child is in trouble and blames someone else. The child does not appreciate the significant [sic] of the lying. Dr. Bernet further suggested the concept of parental misinterpretation and suggestion. This occurs when parents ask repeated questions and suggest answers causing the child to learn answers that are expected. Dr. Bernet also suggested that the parents misconstrued the physical condition of Emmalee and suggested that her physical problems resulted from a yeast infection. He also suggested that both Dr. Meyer's and Nan Buturff's interviews were suggestive. He further suggested that children confuse reality and fantasy and sometimes conflate their statements when they do not know the answer. He also questioned the lack of a free narrative of the events as opposed to frequent questioning. He criticized the DCS investigation for not seeking alternate explanations for Emmalee's disclosures. He concluded with a likely scenario that Emmalee was engaged in innocent normal self touching. When criticized by her mom, she blamed dad through the process of innocent lying. This explanation was further reinforced by the repeated questioning of Emmalee as well as the physical examinations.

The Court places little credence or weight on Dr. Bernet's opinions and conclusions. Several of his conclusions are contradicted by his own research and publications. For example, he testified that the sexual abuse of a three-year-old is rare. However, in research he relied upon, the statistics show that most sexual abuse occurs within the ages of three to six years. In spite of his conclusion that Emmalee was not telling the truth, his prior research indicated that the overwhelming number of child sexual abuse reports were true. He opined that the physical condition of the child might have been yeast infections. However, the medical records indicate that Dr. Meyer never treated Emmalee for a yeast infection until after the events in question. He criticizes the interview technique because it was not in a narrative form. Common sense

dictates that it would be fairly unreasonable that a three-year-old child could engage in a narrative discussion of inappropriate touching. He opines that the sexual touching disclosures could be explained by suggestion. However, his own research relies on a study of thirty-nine children who were given a suggested scenario. Only three of the children repeated the suggestion when later interviewed. In conclusion, the Court does not accredit the opinion and conclusions of Dr. Bernet.

The Court has carefully examined the disclosures of Emmalee. The Court does not find that the mother suggested any answers to Emmalee when she first observed the child's self stimulating activity. Emmalee's revelations that her dad was touching her were spontaneous and remained consistent during the period from February through April. The questioning by Dr. Meyer revealed another consistent and spontaneous disclosure. Finally, the disclosure in April to Nan Buturff was again consistent, spontaneous and dramatic. It should be noted that Ms. Buturff was allowed to opine that Emmalee was the victim of child sexual abuse. This opinion was based upon many hours of child therapy with Emmalee after the initial disclosure. The Court does not rely on Ms. Buturff's expert opinion in forming its own conclusions. Ms. Buturff's testimony regarding the first disclosure is persuasive that Emmalee was relating a consistent story about her father's inappropriate touching.

Finally, the testimony of Beverly [G.] was both compelling and credible. Ms. [G.] is the mother of Trisha [O.], Emmalee's mother, and a retired school teacher. During the period that Emmalee was making these disclosures, Ms. [G.] and her husband were on vacation. Ms. [G.] did not learn of these disclosures until the first of May. Ms. [G.] was helping Emmalee's mother with Emmalee's shower. Ms. [G.] took Emmalee into a bedroom and set her on a bench. As she was putting on Emmalee's underpants, Emmalee said "these are my heart pants." "This is where Dad pokes." Emmalee then used her finger to point to her vaginal area and put her finger between her legs. This statement was not the result of any questioning by Ms. [G.], but was another spontaneous and consistent statement indicating inappropriate touching. The Court finds that the disclosures of Emmalee are true and credible.

Credibility of Father's Explanation

The father explains that any touching by him of Emmalee was the result of normal parenting responsibilities. The Court does not accredit his testimony

-10-

and the explanations offered by him. His testimony is contradictory in many aspects, unreasonable in the extreme and defy's [sic] logic and common sense. Rarely did he answer a question directly. Instead he prefaced most of his answers to the point that they were evasive and entirely self serving. The Court will discuss some of his testimony to illustrate these points.

Emmalee visited the father's house during the week of April 22 thru 26. Upon her return to the mother's home, she revealed that she wanted to see Dr. Meyer and described a sexual incident that occurred at her father's house on April 26. In father's testimony, he described this event in detail. He state[d] that Emmalee was on the couch and he was changing her clothes. Emmalee spread her legs and vagina and stated that this is "what Dr. Meyer does." Father stated that he took his two thumbs and spread the lips of her vagina. He noticed a white discharge indicative of a yeast infection. He then put some lotion in the vaginal area. While he was wiping the area, Emmalee jumped off the couch and cried in pain. He then gave her some yogurt before bed. According to his testimony, he instructed Emmalee to tell her mother to take her to see Dr. Meyer for a yeast infection. He returned Emmalee to her mother the next day. On April 29, just days after the incident, the wife reports the disclosure of Emmalee to DCS. Emmalee is taken for a forensic interview and a physical examination by Dr. Meyer. On this same day, law enforcement arranged the recorded phone conversation wherein the mother tells the father for the first time that Emmalee has made accusations concerning his touching. At no time during this conversation did the father mention this episode to the wife. He denied that he had ever touch[ed] Emmalee inappropriately. Certainly the event was fresh in his memory since Emmalee reacted to his touching with a display of pain and he had instructed Emmalee to tell her mother to take her to see Dr. Meyer. Inexplicably, he makes no reference to his wife about this incident. Furthermore, the wife asks the following question:

[MOTHER]: Why would she specifically ask me to take her to Dr. Meyer and say "my putty hurts, I need to go see Dr. Meyer."

[FATHER]: I don't have a clue.

Wife's question specifically referenced seeing Dr. Meyer, yet father's memory is not refreshed enough to recall the incident mentioned above.

Further in this conversation, father opines that a third person could have touched Emmalee. He specifically mentioned Conner, wife's son by another marriage, as well as wife's father. [Father] explains his accusation of Conner because he is a teenage boy with hormones and that he has been alone with Emmalee. Father accuses the wife of falsifying these accusations in order to gain an advantage in their pending divorce. He refers to this theme numerous times during his later testimony. However, he points out no material evidence for support of this allegation. Finally, during this conversation, he mentions that he had thought earlier that Emmalee should be seen by a doctor because he didn't trust Conner.

It would have been reasonable and logical for the father to have revealed during this phone conversation that just days earlier he had spread the lips of Emmalee's vagina and it had caused her pain. This omission reflects the lack of credibility consistent in father's testimony. Furthermore, it is against logic that father failed to tell wife himself about this incident the next day in order to avoid a revisiting of the painful experience by Emmalee. Instead, he tells his daughter to report it to a wife [sic].

The same day that the recorded phone conversation occurred, father was interviewed by law enforcement agents. He, again, failed to mention the incident in which he opened the lips of Emmalee's vagina and that she reacted in pain. He also told the agents that the last time he noticed any vaginal irritation or yeast infection was six weeks ago. Further in his interview, he denied that he had ever opened up the vaginal area of Emmalee. He further stated that it had been forever since he had put any lotion on Emmalee. He repeatedly said he had no idea why Emmalee was making these accusations. He also repeated his accusation against Conner and even accused Conner of "hanging around a criminal." He reiterated his suggestion that his wife was using these disclosures for her gain. Once again, father had ample opportunity to relate to law enforcement officials the incident that took place at his home during Emmalee's last visit during the latter part of April. In fact, father did not mention this incident to anyone until he had the opportunity to view the forensic interview, participate in the discovery process and review the medical records. Thereafter, after learning that Emmalee had disclosed this incident, father related his version of the events. It is the Court's finding that he deliberately withheld the details of this incident until he realized that Emmalee had told her mother about the event.

The father consistently portrayed himself as the defender of his children. He never ascribed that role to the wife. He testified that when he noticed Emmalee engaging in touching herself, he called his sister to determine if that conduct was inappropriate. He never discussed his concern about the normalcy of the conduct with his wife which would have been the commonsense approach to the problem. He testified at length about wife's failure as a care giver and parent in an effort to obfuscate his improper relations with Emmalee. He sought to accuse other persons without a shred of any evidence except his imagination.

Emmalee was described by all the witnesses that interacted with her as a very bright and intelligent girl. The father stated she was as smart as anyone he knows. The evidence in this case convinces the Court that Emmalee's disclosures were credible and that the father's testimony and explanations were not. This Court concludes that the father sexually abused a child under thirteen years of age by engaging in sexual contact for the purpose of sexual gratification.

In March 2014, following a hearing, the Trial Court entered its Dispositional Order wherein the Trial Court enjoined Father from having any contact with his two daughters and placed sole custody of the children with Mother. The Trial Court found the Child to be a victim of severe child abuse by aggravated sexual battery under Tenn. Code Ann. § 39-13-504. Both of Father's daughters were found to be dependent and neglected. The Trial Court also entered an order awarding guardian ad litem fees against Father to the guardian ad litem in the amount of $5,900.00. Father timely appealed to this Court.

## Discussion

Father raises a host of issues on appeal. We first will address those many issues of Father that we regard as ancillary or procedural, having restated or consolidated them as we deem appropriate. We will address finally the paramount issue of this appeal: whether clear and convincing evidence supports the Trial Court's finding that Father committed sexual abuse against the Child.

We first address whether the Trial Court erred in admitting the out of court statements of the Child. Rule 803(25) of the Tennessee Rules of Evidence specifically provides for the admission of statements made by a child alleged to be the victim of physical, sexual or psychological abuse or neglect in civil actions concerning dependency and neglect pursuant to Tenn. Code Ann. § 37-1-102(b)(12), or matters of severe child abuse. The admission is subject to circumstances establishing trustworthiness. In the instant case, the

disclosures of the Child to the forensic interviewer, Buturff, Dr. Meyer, the grandmother and Mother corroborate and sustain the reliability of the statements. Father had ample opportunity to question and examine the conveyors of the disclosures. We find, as did the Trial Court, that the out of court statements of the Child were sufficiently bolstered by indicia of reliability so as to render them admissible. The Trial Court did not err in admitting the out of court statements of the Child.

We next address whether the Trial Court erred in denying Father's motion to dismiss for failure to state a prima facie claim. According to Father, "[t]he facts set forth in [DCS's] petition are insufficient to support the allegation of the underlying criminal acts." This issue begs the question. We are met in this appeal for the very purpose of determining whether clear and convincing evidence supports the allegations of inappropriate touching. DCS's allegations of Father improperly touching the Child's vaginal area reasonably constitute an allegation of severe child abuse. This issue is without merit.

We next address whether DCS violated Father's due process rights under the U.S. and Tennessee Constitutions. As part of his argument on this issue and others, Father widely attacks the investigative processes and methods used by DCS. At oral arguments, Father invited this Court to take this opportunity to herald in sweeping reforms of DCS. We decline Father's invitation. We are constrained to decide only the matter properly before us. As to Father's claims of due process violations, we see no evidence in the record revealing such violations. Father has had abundant opportunity to present his side of this case, in proceedings both before the Juvenile Court and the Trial Court, and now, on appeal. We also take this opportunity to state that, contrary to much of Father's implicit argument, the appeal before us is a civil matter, not a criminal one, despite the very serious allegations raised. This issue is without merit.

We next address whether DCS violated the Accardi Doctrine. The Accardi Doctrine refers to a doctrine originating in *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954) which relates to an agency's requirement to adhere to the rules and regulations to which it is bound. What is before us is an appeal of the Trial Court's finding of severe child abuse against Father and not any decision of an agency. We hold that the Accardi Doctrine is inapplicable to this appeal, and this issue is without merit.

We next address whether the Trial Court erred by allowing the social worker to testify and offer expert testimony regarding sexual abuse based on play therapy games. The glaring flaw in this issue as raised by Father is that the Trial Court specifically stated in its order that it did not rely on Buturff's expert opinion. Rather, the Trial Court considered Buturff's testimony only to the extent it determined that the Child's disclosures were consistent. This issue is without merit.

We next address whether the Trial Court erred in excluding the results of Father's polygraph test which purportedly indicated he told the truth in denying that he abused the Child. Tennessee courts have rather consistently taken a dim view regarding the admissibility of polygraph results, and we have been presented with no sufficient reason to take a different view. *See State v. Damron,* 151 S.W.3d 510 (Tenn. 2004). The Trial Court did not err in refusing to admit the results of his polygraph test.

We next address whether the Trial Court erred in not allowing in evidence of Mother's alleged mental health problems and in denying Father's motion for a psychiatric examination of Mother. Father alleges that Mother suffers from mental health problems and that this somehow is relevant in resolving the issue of whether allegations of sexual abuse of the Child by Father are true. In our view, Father fails to establish how Mother's alleged mental health impairments intersect with the allegations of sexual abuse by Father in this case. The Trial Court committed no error in precluding this line of evidence. This issue is without merit.

We next address whether the Trial Court erred in requiring Father to pay guardian ad litem fees and setting fees in excess of the maximum allowed by Supreme Court Rule 13. Father misconstrues the statute, Tenn. Code Ann. § 37-1-150, which applies to funds paid from county funds. That is not the case here as these fees were not to be paid from county funds. The Trial Court did not err in awarding guardian ad litem fees against Father.

We next address whether the Trial Court erred in including a provision in the Dispositional Order restraining Father from contacting Mother. Tenn. Code Ann. § 37-1-130(a) permits the trial court to set conditions and limitations under these circumstances of dependency and neglect. The Trial Court acted within its authority in ordering Father not to contact Mother. We also hold that given the circumstances of this case, the Trial Court did not err in denying Father visitation with his daughters. This issue, as were all of Father's previously addressed ancillary issues, is without merit.

The final and central issue we address is whether clear and convincing evidence supported the Trial Court's finding that Father committed sexual abuse against the Child. This Court has outlined the standard of review in dependency and neglect and cases of severe child abuse as follows:

> A child who is suffering from abuse is a dependent and neglected child. *See* Tenn. Code Ann. § 37-1-102(12)(G). A determination that a child is dependent and neglected must be supported by clear and convincing evidence. *See* Tenn. Code Ann. § 37-1-129(a)(1) & (c). Severe child abuse in a

-15-

dependency and neglect proceeding must also be established by clear and convincing evidence. *In re S.J.*, 387 S.W.3d 576, 591 (Tenn. Ct. App. 2012).

The "clear and convincing evidence standard" is more exacting than the "preponderance of the evidence" standard, although it does not demand the certainty required by the "beyond a reasonable doubt" standard. *In re C.W. W.*, 37 S.W.3d 467, 474 (Tenn. Ct. App. 2000). The clear and convincing evidence standard defies precise definition. *Majors v. Smith*, 776 S.W.2d 538, 540 (Tenn. Ct. App. 1989). Evidence satisfying this high standard produces a firm belief or conviction regarding the truth of facts sought to be established. *In re C.W.W.*, 37 S.W.3d at 474. Clear and convincing evidence eliminates any serious or substantial doubt concerning the correctness of the conclusions to be drawn from the evidence. *Hodges v. S.C. Toof & Co.,* 833 S.W.2d 896, 901 n. 3 (Tenn. 1992).

Our review of the trial court's determinations on questions of fact is de novo with a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). Whether a child has been proven dependent and neglected by clear and convincing evidence is a question of law which we review de novo without a presumption of correctness. *In re H.L.F.*, 297 S.W.3d 223, 233 (Tenn. Ct. App. 2009). To the extent the trial court's determinations rest upon an assessment of the credibility of witnesses, the determinations will not be overturned absent clear and convincing evidence to the contrary. *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

*In re: Kaitlynne D.*, No. M2013-00546-COA-R3-JV, 2014 WL 2168515, at *1-2 (Tenn. Ct. App. May 21, 2014), *no appl. perm. appeal filed*.

DCS articulates the gravamen of its argument in its brief on appeal as follows, in part:

The record is undisputed that Emmalee made the statements attributed to her by Mother, Dr. Meyer, the forensic interviewer, Nan Buturff, and [the grandmother]. Father offered no proof to dispute that the allegations were made. The record confirms the consistency of Emmalee's disclosures and contains no evidence that Mother suggested any answers to Emmalee when she first observed the self-stimulating behavior. Emmalee's statements that Father was touching her were spontaneous and consistent from February through April, which is supported by the facts in the record. The statements made to

[Dr.] Meyer and Nan Buturff were also consistent and dramatic. Although the Court specifically did not rely upon any expert opinions rendered by Ms. Buturff in formulating the opinion, the Court did rely upon Ms. Buturff's credible testimony regarding Emmalee's first disclosure to her.

The evidence is clear and convincing that Emmalee's disclosures reflect actual incidences of inappropriate contact by the father rather than the product of suggestion, or of innocent lying, or of parental misinterpretation or confusion. If the numerous consistent statements by Emmalee leave any room for doubt, it is removed by Father's own testimony regarding his detailed hands on examinations of Emmalee's vagina, the fact that he spreads the lips of her vagina every time he wipes her in the bathroom, and the timing of his disclosure of these parenting methods. Father's initial denial to Mother and to law enforcement of any possible actions that he could have taken which would constitute poking or rubbing Emmalee's vagina gives way to his detailed accounting of doing just that. It makes no difference whether the event occurred in March, 2011, or April, 2011, the events described by Father in which he placed his eye level with Emmalee's vagina in order to see it, while spreading it apart and rubbing up and down and poking it with his washrag wrapped thumb until she leaped from the sofa in pain is narrowly tailored to excuse the precise inappropriate behavior that Emmalee has consistently reported. (Citation omitted)

Father, for his part, adamantly denies ever having touched the Child's vaginal area for any improper purposes. Regarding his not going into detail about the March incident whereby he asserts that he examined the Child for a yeast infection, Father states that he did not realize at first that the allegations against him dated back to March and did not stem just from his final April visitation with the Child. According to Father, when he was initially pressed about these allegations, he did not think back to the March incident.

Trial courts are entitled to a high degree of deference on credibility determinations. Here, the Trial Court made strong, unequivocal credibility findings. The Trial Court found to be credible the Child's disclosures of Father's poking and rubbing her vagina. The Trial Court found Father to be a non-credible witness and did not believe Father's account of events. Further, the Trial Court did "not accredit the opinion and conclusions of Dr. Bernet [Father's expert forensic psychiatrist]." The record before us does not contain clear and convincing evidence to the contrary as to the Trial Court's credibility determinations.

-17-

This, however, does not end our inquiry. We still must resolve whether the evidence to sustain the allegation of severe child abuse against Father rises to the level of clear and convincing evidence. While Father's credibility, as found by the Trial Court, is nil, there still must be some *affirmative* evidence of child sexual abuse rising to the level of clear and convincing evidence. In other words, the *absence* of Father's credibility does not alone necessarily equal the *presence* of clear and convincing evidence that Father committed sexual abuse against the Child. We find that the record does contain such evidence.

It is undisputed that Father touched the Child's vaginal area many times. Indeed, Father acknowledges having done so many times as part of his normal parenting responsibilities. The question is whether Father sexually abused the Child. Normal parenting responsibilities and sexual abuse are, obviously, very distinct activities, and in order to sustain an allegation of sexual abuse against Father, there must exist clear and convincing evidence of an act that is sharply different from the sort of routine touching a parent may exercise in the course of, for instance, attending to a child's hygiene.

DCS and Mother present several reasons why the touching described by the Child must be considered sexual abuse: the fact that the Child only ever identified Father as the one who touched her "putty"; the fact that the Child's vagina was red or irritated in the aftermath of Father's touching; that the Child disclosed that she once told Father to stop; the spontaneity of at least many of the Child's disclosures; and, that the Child, concurrent with the underlying timeframe of the alleged episodes of abuse, engaged in acts of self-touching or self-stimulation.

The evidence in the record on appeal, especially given the Trial Court's credibility determinations, is quite damning to Father. The Child made multiple disclosures to multiple people that Father poked, rubbed, and otherwise touched her vagina. The evidence is that the Child's vagina was irritated upon return from visitation with Father. The Child demonstrated mood swings and exhibited opposition to going to Father's home during this period. During this period, the Child engaged in self-touching behavior. Also notable is the fact that the Child has consistently identified only Father as the perpetrator of these actions. All of these facts support a scenario whereby Father sexually abused the Child by inappropriately touching her vagina. Father, given the Trial Court's credibility determinations, presented very little, if any, believable evidence to the contrary.

Father's explanation that the touching was normal parenting behavior strikes us as hollow. Father continually tries to frame the issue as a misunderstanding and that the Trial Court confused the March incident with what did or did not happen in April. The Trial Court found Father not credible, and we do not disturb that credibility determination. We further do not believe that repeated touching of one's three year old daughter's vagina, to the

point where she comes home with vaginal irritation and speaks out about the touching to numerous parties, falls within the category of normal parenting responsibilities. Father's belated explanations of these incidents, as found by the Trial Court, are not believable and are contrary to the evidence in the record now before us.

On appeal and at the trial level, Father has tried to make this case about practically everything but whether he abused the Child. Father has cast aspersions towards male members of the Child's family, accused Mother of pressing the allegations for gain in their divorce proceedings, and asked this Court to overhaul DCS. In the final analysis this case is about a minor child's allegations of her father improperly touching her vagina and the surrounding related evidence showing this touching was sexual. The best Father has been able to provide is that he thoroughly cleaned and examined his daughters for yeast infection or other health problems. Father diligently has provided dates and detailed accounts for these alleged occurrences, including the alleged early March check for a yeast examination. In a way, Father explains too much. Far from serving as a plausible explanation for the Child's disclosures, Father's belated and hyper-detailed accounts of long ago alleged yeast infection examinations ring to this Court, as they did to the Trial Court, artificial. It is not surprising that the Trial Court found Father not to be credible.

In this Court's judgment, there exists no substantial or serious doubt that the disclosures by the Child, as supported by the evidence, describe sexual abuse. Thus, we hold that the evidence presented to the Trial Court against Father rises to the level of clear and convincing. We, therefore, affirm the judgment of the Trial Court.

## **Conclusion**

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Alan O., and his surety, if any.

_____
D. MICHAEL SWINEY, JUDGE