FILED

05/19/2021

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 1, 2021

IN RE ANGELLEIGH R.

**Appeal from the Circuit Court for Marshall County**
**No. 2019-CV-50          M. Wyatt Burk, Judge**
_____

**No. M2020-00504-COA-R3-JV**
_____

THOMAS R. FRIERSON, II, J., concurring in part and dissenting in part.

I respectfully dissent from the majority's decision to reverse the trial court's determination that Angelleigh R. ("the Child") had been the victim of severe child abuse while living with her mother, Amanda B. ("Mother"), and Mother's paramour, J.M. As noted in the majority opinion, both Mother and J.M. were parties to the proceedings in juvenile court as well as the *de novo* appeal to the Marshall County Circuit Court ("trial court"). However, the trial court's dependency and neglect determination as to Mother was based solely on educational neglect while the trial court's determination of severe child abuse was based solely on its finding of sexual abuse perpetrated against the Child by J.M. Mother was not accused of severe child abuse or failing to protect the Child from such abuse. Although Mother has perfected an appeal to this Court, J.M. did not appeal the determination that he had severely abused the Child, and thus the existence of Mother's standing to appeal that particular determination, which was not rendered with respect to her, is somewhat uncertain. *See Clark v. Perry*, No. 02A01-9704-CH-00080, 1998 WL 34190562, at *7 (Tenn. Ct. App. Mar. 19, 1998) ("As a general rule, . . . a party lacks standing to appeal an order entered against a co-party who has elected not to appeal that order."). Nevertheless, assuming, *arguendo*, that Mother possesses the proper standing to appeal the trial court's determination that J.M. severely abused the Child, I believe that the trial court's determination should be affirmed.

This Court's review of the trial court's judgment following a non-jury trial is *de novo* upon the record with a presumption of correctness as to the trial court's findings of fact unless the preponderance of the evidence is otherwise. *See* Tenn. R. App. P. 13(d); *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 204 (Tenn. 2012). "In order for the evidence to preponderate against the trial court's findings of fact, the evidence must support another finding of fact with greater convincing effect." *Wood v. Starko*, 197

S.W.3d 255, 257 (Tenn. Ct. App. 2006) (citing *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 296 (Tenn. Ct. App. 2001)).

"A determination that a child is dependent and neglected must be supported by clear and convincing evidence." *In re Emmalee O.*, 464 S.W.3d 311, 323 (Tenn. Ct. App. 2015) (quoting *In re Kaitlynne D.*, No. M2013-00546-COA-R3-JV, 2014 WL 2168515, at *1-2 (Tenn. Ct. App. May 21, 2014)). "Severe child abuse in a dependency and neglect proceeding must also be established by clear and convincing evidence." *In re S.J.*, 387 S.W.3d 576, 587 (Tenn. Ct. App. 2012). Our Supreme Court has defined clear and convincing evidence as "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992).

In summary, as this Court has previously explained:

> Under the clear and convincing evidence standard, it is important to "distinguish between the specific facts found by the trial court and the combined weight of those facts." *In re Tiffany B.*, 228 S.W.3d 148, 156 (Tenn. Ct. App. 2007). Each specific underlying fact need only be established by a preponderance of the evidence. . . . Once these specific underlying facts are established by a preponderance of the evidence, the court must step back to look at the combined weight of all of those facts, to see if they clearly and convincingly show severe child abuse.

*In re S.J.*, 387 S.W.3d at 591-92.

When reviewing the evidence, this Court must remain mindful of the fact that the trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Morrison v. Allen*, 338 S.W.3d 417, 426 (Tenn. 2011); *Jones v. Garrett,* 92 S.W.3d 835, 838 (Tenn. 2002). Although "appellate courts are not required to give similar deference to a trial court's findings of fact based on documentary evidence such as depositions, transcripts, or video recordings," *Kelly v. Kelly*, 445 S.W.3d 685, 693 (Tenn. 2014), "[w]hen it comes to live, in-court witnesses, appellate courts should afford trial courts considerable deference when reviewing issues that hinge on the witnesses' credibility because trial courts are 'uniquely positioned to observe the demeanor and conduct of witnesses.'" *Id*. (quoting *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000)).

In this matter, the trial court heard live, in-court testimony from several witnesses, including Mother, J.M., the Child's former teachers, the DCS investigator, and others. The DCS investigator, Lori Shaw, testified that she interviewed the Child at school on October 17, 2018, following a report that the Child had disclosed possible sexual abuse. Ms. Shaw related that when she interviewed the Child, she asked the Child if anyone had

hurt her, and the Child reported that "[J.M.] put hand sanitizer down there, as she motioned toward both her vagina and her rectum." Ms. Shaw also testified that this disclosure was consistent with the disclosure that the Child had made to the individual who had reported the purported abuse to DCS. Ms. Shaw then attempted to locate Mother by going to the address Mother had provided to the school and leaving her card on the door; however, as Ms. Shaw stated, Mother did not contact her.

According to Ms. Shaw, she was able to speak to Mother two days later on October 19, 2018, when two sheriff's department detectives went to the home Mother shared with J.M. at a different address and located Mother. Ms. Shaw explained that Mother was initially cooperative and agreed to bring the Child to a forensic interview the following week; however, Mother later refused to bring the Child to the interview, necessitating that Ms. Shaw seek a court order for such interview to be conducted.

Ms. Shaw acknowledged that she had reviewed the video of the forensic interview and knew that the Child had made certain claims against J.M. that appeared to be exaggerated. Ms. Shaw stated, however, that she believed the Child's disclosure regarding the hand sanitizer incident made during the initial part of the forensic interview to be true because it was consistent with the disclosure made to her and to the Child's teachers.

In addition, two teachers from the Child's former school testified that on the day in question, the Child was fidgeting and repeatedly putting her hands down the front of her pants. One teacher, Pat Esmond, who worked with the Child in her special education class, stated that she asked the Child to go to the bathroom and wash her hands because the Child had her hands in her pants. Ms. Esmond related that she asked the Child why she was placing her hands in her pants, and the Child replied that she was "hurting." When Ms. Esmond questioned why she was hurting, the Child replied, "J.M. messes with me down there," and related that J.M. had put hand sanitizer "down there." Ms. Esmond testified that it was clear that the Child was referring to her vaginal area as "down there." Although Ms. Esmond acknowledged that the Child had mentioned having pinworms at an earlier date, she stated that it was a different timeframe. When asked whether the Child had mentioned hot sauce, Ms. Esmond replied that the Child had reported that J.M. was "mean" to her and would put hot sauce in her eyes. Although Ms. Esmond acknowledged that children of that age had a propensity to make up stories, she indicated that she believed the Child because her statements about J.M. were consistent.

Another teacher, Laura Burke, who also worked in the special education program, testified that the Child was scratching her vaginal area and putting her hands in her pants during the day in question. Ms. Burke stated that the Child did not normally demonstrate this behavior, so Ms. Burke questioned her regarding what was wrong. The Child responded that J.M. had put hand sanitizer on her vaginal area. Ms. Burke related that she was able to tell that the Child was "irritated" because of the Child's behavior. When

asked about pinworms, Ms. Burke acknowledged that the Child had suffered from pinworms at some point but explained that the Child put her hands down the back of her pants when she had pinworms. Ms. Burke stated that she believed the Child's disclosure about J.M. and the hand sanitizer by reason of the detail with which the Child described the event and the fact that the disclosure was spontaneous.

In its March 6, 2020 order, the trial court specifically found the teachers' respective testimonies to be credible, stating in pertinent part:

> In considering the testimony of the witnesses here today, the court is convinced by the witnesses and the video of the forensic interview that the sex abuse occurred. The court was able to personally witness the demeanor of the witnesses, their facial expressions, and the often prolonged pauses between the questions posed and the answers given, believing that the teachers and the child were convincing, and that this court will credit their testimony that this event did in fact occur.
>
> The child was able to specifically articulate the manner in which this sexual act occurred and the court finds clearly and convincingly it did, in fact, occur. The child's frequent touching of this area was further evidence of this fact. When the question was posed to her; she was consistent in answering yes.

The trial court, therefore, made a specific finding that the teachers were credible witnesses based upon the court's observation of each witness during her testimony. Although the court did not expressly find that Mother and J.M. lacked credibility in their respective denials that the abuse occurred, the court's findings and ultimate determination obviously imply that the trial court did not credit their testimony. *See Richards v. Liberty Mut. Ins. Co.*, 70 S.W.3d 729, 733 (Tenn. 2002) ("[T]he trial court's findings with respect to credibility . . . generally may be inferred from the manner in which the trial court resolves conflicts in the testimony and decides the case."); *see also Edmunds v. Delta Partners, LLC*, 403 S.W.3d 812, 824-25 (Tenn. Ct. App. 2012) (same). Again, this Court is required to afford the trial court "considerable deference when reviewing issues that hinge on the witnesses' credibility because trial courts are 'uniquely positioned to observe the demeanor and conduct of witnesses.'" *See Kelly*, 445 S.W.3d at 693. "This is particularly true when the credibility of the witnesses and the weight assigned to their testimony are critical issues." *Richards*, 70 S.W.3d at 733. The trial court's assessment of credibility "will not be overturned on appeal absent clear and convincing evidence to the contrary." *Morrison,* 338 S.W.3d at 426.

This record does not contain clear and convincing evidence sufficient to overturn the trial court's credibility determinations. In fact, when reviewing Mother's testimony, I noted certain discrepancies between Mother's testimony and other evidence presented

- 4 -

that would support the trial court's implied finding that Mother lacked credibility. For example, Mother testified that she had asked the Child's pediatrician during an August 2018 well visit to describe for her the "signs" that a child had been abused. According to Mother, this questioning followed a report by the Child's biological father that during the Child's summer visitation with her father, the Child had disclosed to him sexual abuse by someone named "Joker," although Mother claimed to know no one by such name. By contrast, Ms. Shaw stated that Mother had told her that Mother had taken the Child to the doctor in August 2018 specifically regarding this abuse disclosure and was told by the doctor that the Child had not been abused. Ms. Shaw testified that she had obtained the doctor's records and discovered that there was no mention of a disclosure of sexual abuse. Ms. Shaw stated that the visit was recorded as a normal well Child visit instead. Ms. Shaw explained that doctors have a mandatory duty to report any allegation of abuse, thus highlighting the significance that the doctor did not do so in this instance.

In addition, it is curiously coincidental that Mother decided to withdraw the Child from school and homeschool her two days after the Child was interviewed by Ms. Shaw concerning the abuse disclosure despite Mother's claim that she had no knowledge that such disclosure or interview had occurred when she made this decision. Although Mother was described by Ms. Shaw as cooperative upon their initial meeting, Mother later refused to bring the Child to the forensic interview, forcing DCS to obtain a court order to accomplish the interview. Moreover, although Mother acknowledged that she knew that she was supposed to take the Child for trauma therapy and testified that the Child went to trauma counseling "once a week for at least four or five months," the therapist testified that he only had five sessions with the Child in January and February 2019. Although Mother claimed that she had informed the therapist of the sexual abuse allegations, the therapist stated that Mother simply asked him to look for signs of abuse and disclosed no specific abuse allegations. Mother further claimed to have taken the Child to a medical center in October following the abuse allegation at issue, testifying that the Child was examined and nothing concerning was found. Significantly, no corroborating evidence was entered to substantiate this claim.

The majority opinion notes the fact that the Child made no further disclosures of sexual abuse following the October 2018 disclosures made to her teachers, the DCS investigator, and the forensic interviewer. Notwithstanding, I consider it significant that Ms. Urvan, who was employed by the Child's current residential school, testified that it was "quite possible" that during the timeframe closer to trial when Ms. Urvan was interacting with the Child, the Child likely could not remember "if there was anything that was happening in fall of 2018 related to [J.M.]" because of the Child's cognitive delays. When Ms. Urvan was questioned regarding whether the Child would talk to her about things that happened a year or more ago, she replied that the Child "does not have a good concept of time" and that it would be very difficult for the Child to recall events that happened in October 2018.

I submit that the in-person testimony supports the trial court's determination that the underlying fact of the October 2018 hand sanitizer incident was established by a preponderance of the evidence. Significantly, the record also contains the video of the Child's forensic interview, which was conducted close in time to the abuse disclosures made to the teachers and the DCS investigator, Ms. Shaw. Although this Court does not afford the same deference to the trial court's assessment of such evidence, *see Kelly*, 445 S.W.3d at 693, my review of the video supports the trial court's determination concerning the credibility of the Child's abuse disclosure made therein. The Child's abuse disclosure was spontaneous, following a general discussion of "private parts" by the interviewer. The disclosure was specific and consistent with what the Child had previously stated to her teachers and Ms. Shaw. When questioned further, the Child was able to relate that the abuse occurred at home when she was in bed and that she told J.M. "no" despite his proceeding with the abusive behavior. The Child's affect and tone during the initial disclosure appeared to be consistent with that of a Child who was answering questions about a factual event. It is only much later in the interview, after participating in another twenty-plus minutes of discussion with the interviewer, that the Child begins to aggrandize the stories about J.M. being "bad," relating clearly exaggerated narratives about J.M. and other subjects. Such behavior is explained by evidence concerning the Child's cognitive condition combined with the length of the interview and is clearly distinguishable from the tone of her earlier, consistent disclosure. Ergo, I agree with the trial court's finding that the early disclosure made during the forensic interview was credible, and I must again conclude that the underlying fact of the hand sanitizer incident was supported by a preponderance of the evidence.

Having determined where the preponderance of the evidence lay with regard to the specific underlying facts, the trial court was required to "step back to look at the combined weight of all of those facts, to see if they clearly and convincingly show severe child abuse." *In re S.J.*, 387 S.W.3d at 591-92. The trial court concluded that the established facts did clearly and convincingly show severe child abuse, and I agree. J.M.'s touching of the Child and application of hand sanitizer to her vaginal area would clearly constitute aggravated sexual battery, in violation of Tennessee Code Annotated § 39-13-504, and therefore would also constitute severe child abuse pursuant to Tennessee Code Annotated § 37-1-102 (b)(27)(C).

For the foregoing reasons, I am of the opinion that the trial court's determination that J.M. severely abused the Child should be affirmed. I therefore respectfully dissent from the majority's decision to reverse that portion of the trial court's judgment. I concur in the remainder of the majority's opinion.

s/Thomas R. Frierson, II

_____
THOMAS R. FRIERSON, II, JUDGE

- 6 -