IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
April 19, 2018 Session

IN RE EMMALEE O., ET AL.

Appeal from the Circuit Court for Knox County
No. 126793   Gregory S. McMillan, Judge

_____

No. E2017-01605-COA-R3-JV

_____

This appeal involves the issue of past child sexual abuse by a parent. After the original trial de novo, the father was found guilty of severe child abuse and was enjoined from contact with the child and another daughter. A prior appeal resulted in an affirmance of the trial court's finding. *In re Emmalee O.*, 464 S.W.3d 311 (Tenn. Ct. App. 2015). After permission to appeal was denied by the Tennessee Supreme Court and the U.S. Supreme Court, the father filed a motion to vacate or modify the 2014 ruling of the trial court. After the trial court denied the relief requested, the father again appealed. We affirm the trial court's decision.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., and THOMAS R. FRIERSON, II, JJ., joined.

Alan Lee O., Knoxville, Tennessee, pro se appellant.

Herbert H. Slatery, III, Attorney General and Reporter, and W. Derek Green, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

Patti Jane Lay, Knoxville, Tennessee, for the appellee, Trisha O.

## OPINION

## I. BACKGROUND

Alan O. ("Father") married Trisha O. ("Mother") in August 2006. Mother had two children from a prior marriage. The marriage was the first for Father, then 50 years of age. Father and Mother had two daughters together, Emmalee ("the Child"), born September 2007, and Abigail, born in August 2009.

Problems had already arisen in the marriage prior to Abigail's birth. Father eventually left Mother's house, the marital residence, and the couple began 50/50 visitation with the children.

In March 2011, after the Child told Mother that Father had rubbed her vaginal area, Mother took her daughter to the children's pediatrician, Dr. Meyer, who examined the Child, noticed vaginal irritation, and reported the matter to the Tennessee Department of Children's Services ("DCS"). The initial report, however, yielded no investigation by DCS. Mother monitored the situation and sought advice from Licensed Clinical Social Worker Nan Buturff. As noted in this court's prior opinion:

> In late April 2011, the Child stayed with Father for another visitation. Afterwards, the Child told Mother that she wanted to go see Dr. Meyer, and that Father had "poked" her in her vaginal area. Mother took the Child to Dr. Meyer for another examination, which revealed irritation in the vaginal area. Mother then took the Child to see Buturff. Buturff asked the Child if anyone had touched her vagina. The Child stated that Father had. Buturff subsequently reported the matter to DCS, and these legal proceedings followed.
>
> The Child underwent a forensic interview on April 29, 2011. . . . The Child stated that Father had touched her vagina, or "putty," as she called it. . . .

On May 4, 2011, DCS filed a petition for restraining order against Mother and Father. The petition sought: (1) to restrain Father from having contact with the children until further order of the court; (2) a finding that the Child was a victim of severe child abuse by Father; and (3) a finding that both children were dependent and neglected as to Father.

In 2012, the juvenile court found that the Child and Abigail were dependent and neglected and that the Child was the victim of severe child abuse by Father.[1] *In re Emmalee O.*, 464 S.W.3d 311, 314 (Tenn. Ct. App. 2015). After the juvenile court denied Father's petition for rehearing, the case was appealed to the trial court for a trial de novo.

Following a five-day trial, the trial court entered an order in January 2014 finding Emmalee to be the victim of severe child abuse. The court concluded that Father, by the repeated "poking" and "rubbing" of Emmalee's vagina, had "sexually abused a child under thirteen years of age by engaging in sexual contact for the purpose of sexual gratification."[2] *Id.* at 316-21. In March 2014, the trial court "enjoined Father from having any contact with his two daughters . . . placed sole custody of the children with Mother . . . and found the Child to be a victim of severe child abuse by aggravated sexual battery under Tennessee Code Annotated section 39-13-504." *Id.* at 321. The issue of future visitation was remanded to the juvenile court. The court observed that Father could file a motion to modify the no contact order after (1) completing a psychosexual evaluation, (2) providing DCS with the evaluator's identity, (3) engaging in recommended treatment, and (4) authorizing the release of the psychosexual evaluation and treatment records to DCS.

Father appealed to this court, contending that any touching by him of the Child was the result of normal parenting actions. After thorough review, we affirmed the judgment of the trial court on January 27, 2015. This court addressed the "final and central issue" of whether clear and convincing evidence supported the trial court's finding that Father committed sexual abuse against the Child as follows:

> The evidence in the record on appeal, especially given the Trial Court's credibility determinations, is quite damning to Father. The Child made multiple disclosures to multiple people that Father poked, rubbed, and otherwise touched her vagina. The evidence is that the Child's vagina was irritated upon return from visitation with Father. The Child demonstrated mood swings and exhibited opposition to going to Father's home during this period. During this period, the Child engaged in self-touching behavior. Also notable is the fact that the Child has consistently identified only Father as the perpetrator of these actions. All of these facts support a scenario whereby Father sexually abused the Child by inappropriately touching her vagina. Father, given the Trial

---

[1] The order from the juvenile court is not included in the record before us.
[2] The dispositional order from the trial court is absent from the record.

> Court's credibility determinations, presented very little, if any, believable evidence to the contrary.

*Id.* at 325.

In our prior decision, we observed that Father had "tried to make this case about practically everything but whether he abused the Child" and noted that Father has provided a "detailed" explanation that he merely "cleaned and examined Emmalee for a yeast infection or other health problems." We observed:

> In a way, Father explains too much. Far from serving as a plausible explanation for the Child's disclosures, Father's belated and hyper-detailed accounts of long ago alleged yeast infection examinations ring to this Court, as they did to the Trial Court, artificial. It is not surprising that the Trial Court found Father not to be credible.

> In this Court's judgment, there exists no substantial or serious doubt that the disclosures by the Child, as supported by the evidence, describe sexual abuse. Thus, we hold that the evidence presented to the trial court against Father rises to the level of clear and convincing. We, therefore, affirm the judgment of the Trial Court.

*Id.* at 326. In June 2015, the Tennessee Supreme Court denied Father's application for permission to appeal. The U.S. Supreme Court denied Father's petition for writ of certiorari the following October. *Overton v. Tennessee Dep't of Children's Servs.*, 136 S. Ct. 330 (2015).

In November 2015, Father filed a motion to set aside or provide relief from the trial court's order, requesting post-judgment relief under Rule 60.02 of the Tennessee Rules of Civil Procedure. The motion requested dismissal on the following bases: (1) the trial judge "was thoroughly confused about the evidence present . . . and reached a conclusion that was not just wrong, but was factually impossible; (2) there was a question of judicial impropriety in the case due to alleged ex parte communications resulting in the no contact order between Father and Mother; and (3) there was new evidence garnered from a child support proceeding initiated in March 2014 allegedly showing that Mother "misappropriated" child support monies, "speak(ing) to the mother's lack of credibility and the mother's motivations for initiating the allegations of abuse." A plan for visitation and reunification with the children was additionally sought. On February 1, 2016, nunc pro tunc to December 18, 2015, the trial court determined that the juvenile court had jurisdiction over custodial and visitation issues as previously ordered by the trial court in 2014.

On January 12, 2016, Father sought relief in the juvenile court, again requesting post-judgment relief from the trial court's 2014 orders, but under Rule 34 of the Rules of Juvenile Procedure and Tennessee Code Annotated section 37-1-139. In its pre-trial conference order filed on February 22, 2016, the juvenile court, citing res judicata, dismissed Father's request that the adjudicatory and dispositional orders be vacated. The court found that these matters were outside of its jurisdiction and that Father was attempting to "re-litigate" issues already appealed and affirmed. The juvenile court reserved the issue of visitation, construing Father's request as a petition to modify the no-contact order. In an order entered on October 28, 2016, nunc pro tunc August 31, 2016, the juvenile court magistrate denied Father's petition. The juvenile court judge affirmed the magistrate's ruling the following November. An appeal de novo followed in the trial court.

In April 2017, Father supplemented his earlier memorandum of law and fact and asserted alleged new evidence that the Child had reported in February 2014 that Father had touched her vagina because "maybe he put medicine on me." Father further claimed that Mother, who initiated the abuse allegations during a divorce and child custody dispute, fraudulently obtained and misappropriated in excess of $10,000 in childcare monies; the child support court had concluded that Mother was a non-credible witness; and the trial judge had engaged in misconduct. Father additionally asserted that he had passed a psychosexual evaluation that revealed he is a low risk to sexually abuse. He also noted that the Court Appointed Special Advocate ("CASA") conducted an investigation and recommended modification of the existing no visitation order. Father argued that there was no compelling state interest to justify a no contact provision when there is a low or nonexistent risk of abuse.

Trial on the petition was held on May 3, 2017. Father primarily based his arguments on witness William Stanley, a "licensed psychological examiner" and "approved provider" by the Tennessee Sex Offender Treatment Board. Mr. Stanley performed a psychosexual evaluation of Father in October 2015 and subjected Father to multiple tests: the Rapid Risk Assessment of Sexual Offense Recidivism (RRASOR), Static-99, and Bays and Freeman-Longo. According to Mr. Stanley's interpretation of the test results, the scores indicated that Father had a low risk to re-offend. However, Mr. Stanley's only sources of information for Father's offense were Father's own report and a 2011 letter from the district attorney's office declining to prosecute Father for "lack of credible evidence." Mr. Stanley dismissed the trial court's finding that Father had sexually abused the Child because of the "lower evidentiary standard for civil court." Mr. Stanley further opined that he did not believe Father had abused the Child, and he recommended that Father be reunited with the children based on the testing, his review of the "appropriate materials," and "just my gut feeling" that Father was "being open and honest."

DCS' case utilized Dr. James Michael Adler, Ph.D, as an expert on psychosexual evaluations and sexual risk assessments. Dr. Adler co-authored the State of Tennessee's Best Practice Guidelines for sex offender assessment and treatment and has served on the Tennessee Sex Offender Treatment Board since 2002. Dr. Adler identified significant deficiencies in Mr. Stanley's evaluation that failed to satisfy the Board's best practices (i.e., those practices forming the standard for what a court receives). In his opinion, Mr. Stanley's evaluation was insufficient to support any conclusions about Father's risk to reoffend.

Virginia Johnson, a CASA volunteer appointed by the juvenile court, recommended visitation "solely" on the basis of her conversations with Mr. Stanley. Licensed Clinical Social Worker Nan Buturff testified that the Child's emotional problems, though much improved, stemmed from (1) her sexual abuse by Father and (2) the ALS diagnosis and subsequent death of her maternal grandfather, with whom the Child had lived for over a year. Ms. Buturff recommended against contact between the children and Father.

On May 31, 2017, the trial court entered the following order:

> The portion of [Father]'s Petition seeking to vacate the previous order of this Court entered on January 13, 2014 is denied. Some of the evidence upon which [Father] relies predates the previous trial. To the extent that he relied on information he learned from treatment records after the trial, but that were available to him prior to the trial in 2014, those issues are not newly discovered evidence and those issues are res judicata.
>
> The evidence that [Father] asserts is newly discovered consists of a single statement made by Emmalee shortly after the 2014 de novo trial was concluded. In a discussion with her therapist, Emmalee asked her therapist "Why did he do that?" [The child's remark was in reference to why her father had touched her inappropriately]. The child's response to her own question was, "Maybe he put medicine on me." The child's statement does not exonerate [Father]. The child searching for an explanation of the acts previously described by her as being done by [Father] to her and positing a conditional reason is not a basis for ignoring that the Court previously found [Father]'s medication defense to be without merit. There is no basis in law or fact to vacate the Court's previous Order.

[Father] alleges that there has been a change in circumstances such that the Order should be modified. The circumstances that he alleges support modification are as follows:

1) Father was evaluated by William E. Stanley, a Licensed Senior Psychological Examiner and Tennessee Sex Offender Treatment Board Approved Provider. Mr. Stanley concluded that [Father] was a low risk to offend/re-offend. Mr. Stanley's evaluation is unreliable and not credited by the Court for several reasons. Mr. Stanley discounted the finding of the Juvenile Court that [Father] had sexually abused his daughter, the finding by this Court after a trial de novo that [Father] sexually abused his daughter, and gave no credence to the appellate review upholding the Court's findings, due to the findings having been made using the "civil burden of proof." One of the evaluation tests relied upon by Mr. Stanley assigns a "value" to convictions. Due to Mr. Stanley's failure to assign a value for a finding that abuse had occurred, the test cannot be relied upon.

Dr. Michael Adler, the expert witness for the Department of Children's Services (DCS) testified that there were tests available that did not rely on criminal convictions and could assess risk using civil findings of abuse. Furthermore, Dr. Adler testified that one of the tests used by Mr. Stanley had not been empirically evaluated and was considered outdated. Dr. Adler testified that the Tennessee Sex Offender Treatment Board recommends tests other than those used by Mr. Stanley with [Father]. In addition to using different evaluation tests, Dr. Adler indicated that objective testing [to measure physiological responses] should be used to evaluate [Father]. Mr. Stanley's report noted that [Father] failed to answer questions about his sexual activities and use of pornography, topics that are required to be included in an evaluation. Dr. Adler testified that without that information and complete candor on [Father]'s part, the evaluation was not complete and could not be relied upon.

Dr. Adler testified that the risk of re-offense measured by the tests utilized by Mr. Stanley measures the percentage of offenders who are rearrested, not the number of offenders who actually reoffend. Dr. Adler indicated that the rate of re-offense is Forty-two percent higher than the rate of arrest. Dr. Adler also opined that, while it was possible to engage in sex

offender counseling with someone like [Father] who denies the offense, it will be difficult. Dr. Adler also had concerns about [Father]'s amenability to treatment as he had not observed in Mr. Stanley's work product an indication that [Father] had been "honest and open." Dr. Adler noted that [Father] refused to answer normative questions, didn't articulate a plan on how to address with his daughter [in the event of reunification] the fact that his daughter "said" that he did touch her repeatedly in a manner that has [been] found to be inappropriate. Dr. Adler testified that [Father] doesn't see his offending behaviors as a problem. [Father] doesn't see his actions as a boundary issue.

2. [Father] again asserts that the Court should take into consideration the polygraph examination he underwent. That issue is res judicata. [Father] also asserts that the Court should rely upon the decision by the Knox County District Attorney General's decision not to proceed with prosecution of him. This factor was also considered by Mr. Stanley as significant. The decision of the Attorney General is not new information and is of no[] evidentiary significance as to whether the " . . . threat to the child's safety no longer exists[,]" Tenn. Code Ann. § 37-1-167 or that " . . . there is no reasonable likelihood that such abuse will recur." Tenn. Code Ann. § 36-6-301.

3. [Father] relies on the Court Appointed Special Advocate's recommendation as a change in circumstances. The advocate testified that [Father]'s case was her fourth assignment and that she has limited experience with sexual abuse cases and no specific training or expertise in sexual abuse issues. Without elaboration, the volunteer did testify that, in her past employment, she had opportunities to conduct "clearance interviews" with Department of Energy employees who had "issues like this."

4. [Father] asserts that the children are suffering irreparable harm by being separated from him. He points to research that shows children separated from their fathers are much more likely to commit suicide, become addicted to drugs, and run away from home. Nan Buturff, Emmalee's therapist, testified that, as a general proposition, those statistics were accurate. However, she testified that children who have suffered sexual

abuse also share these increased risks. However, the risk of occurrence was greatly decreased with treatment, no matter the cause of the trauma. Ms. Buturff further opined that reintroducing [Father] in the children's lives was a greater risk to their well-being than his absence was.

Ms. Buturff testified that Emmalee's issues have improved since entering into therapy in 2011. With regard to recent issues, Ms. Buturff opined that Emmalee's increased anxiety and acting out were related to her grandfather's health issues as he played [an] important part in her life. Father did not establish the cause and effect relationship he asserted existed.

DCS argues that the appropriate standard the Court should use to determine whether to modify the existing order is whether [Father] can show, by clear and convincing evidence, that the "threat to the child's safety no longer exists." Tenn. Code Ann. § 37-1-167. The statute refers to a court having to make that finding before the child is returned to the "care" of a parent found to have sexually abused a child. [Father] does not seek a return of the children "to his care." He instead seeks visitation and/or the reestablishment of a relationship. [Father] cites Tenn. Code Ann. § 36-6-301 for the proposition that it "favors visitation in order to maintain the parent-child relationship even if the court finds that the non-custodial parent has physical or emotionally abused the child." Memorandum of Law filed January 3, 2017 at page 5, paragraph 22.

[Father]'s portrayal of the Tenn. Code Ann. § 36-6-301 grossly distorts the statute's plain language. The pertinent part of the statute is:

> "After making an award of custody, the court shall, upon request of the non-custodial parent, grant such rights of visitation as will enable the child and the non-custodial parent to maintain a parent-child relationship unless the court finds, after a hearing, that visitation is likely to endanger the child's physical or emotional health. . . . If the court finds that the non-custodial parent has physically or emotionally abused the child, the court may require that

visitation be supervised or prohibited until such abuse has ceased or until there is no reasonable likelihood that such abuse will recur." Tenn. Code Ann. § 36-6-301.

[Father]'s actions have been found to "endanger the child's physical or emotional health." The Court has prohibited contact as a result of [Father]'s actions. It must now be shown that there is no reasonable likelihood that such abuse will recur prior to re-establishing contact.

Based on the evidence, the Court does not find by a preponderance of the evidence that there is no reasonable likelihood that such abuse will recur. The evaluation required by the 2014 Order has not been completed in accordance with the requirements/guidelines of the Tennessee State Sex Offender Board. The material changes asserted by [Father] do not correlate as it being appropriate to reestablish a relationship between [Father] and the children.

[Father]'s Petition seeking visitation or re-establishment of a relationship with the parties' children is denied.

[Father] has asked this Court to modify the prohibition against him contacting Mother by email concerning the children and to increase the frequency with which he is to be provided with school records and photos. The Court did not hear any evidence that would indicate that either of these requests was inappropriate. Accordingly, . . . Mother[] is to provide [Father] with the children's school grades at the conclusion of each semester. Mother is to supply Father with a photo of each child within one week of the child's birthday each year as well as a copy of each child's annual school photo. If an email by Mother requires a reply, [Father] shall continue his current practice of replying to Mother through her attorney. However, on each of those emails, he may also carbon copy ("cc") Mother so that she gets a copy without the need for her counsel to forward it. [Father] shall make only one reply to an email. No more than once a month, [Father] may send an email to Mother concerning the children.

The trial court observed at the July 14, 2017, hearing on the motion to alter or amend as follows:

This is a difficult case. [Father] has had orders and findings made against him that are significant. Judge Blackwood's order required no contact between him and the minor children at issue in this case.

As I read the law, in order to modify that, there must be evidence by clear and convincing proof that there is no reasonable risk of harm to the children.

I tried this case. I listened to Dr. Stanley, the expert on behalf of [Father]. I listened to Nan Buturff, who is the children's therapist and continues to have some contact with them on an ongoing basis, as well as Dr. Adler, who is the expert involved for the Department of Children's Services.

To address some of the issues [Father] raised, he indicates I neglected to address the issue where the age of the children, who are now . . . older than they were at the time of the events that are at issue . . . that it's a factor that I ignored . . . . I discount that because the age of the children alone does not indicate anything about the reasonable likelihood that an offense will recur.

As he indicates, it makes them verbal and able to report and less likely to be a victim, but it doesn't change the balance as I found it. If I neglected to put that in my order and make it clear, that finding shall now be supplemented in the order.

With regard to the Static–99, I don't believe that I can take judicial notice of that. That is a test used in a field in which I have no training and no expertise. And I heard one expert say it was the right test to use, one expert who said that's not the best test to use, and here's why. There are a number of other tests that we would have used in civil litigation that would have greater applicability.

In addition, the expert says that it measures not the risk of re-offending, but the risk of getting caught, because it only says that the percentage of people who have offended once who get caught are x. This expert for DCS said the rate of re-offense is five times the rate of being caught for recidivism.

- 11 -

I simply found that, as required by Judge Blackwood, a minimum thing to do before I could revisit the issue with regard to contact was that a psychosexual evaluation be completed. I found and make it clear in my ruling that based on the expert proof that I heard, one was not performed within the standard requirements of the Tennessee Board such that I can rely on it for the purposes of granting [Father] the relief he was seeking.

With regard to the contact with mother, I listened carefully. I have modified the relief that Judge Blackwood granted, to the extent that I thought appropriate. I was asked not to modify that contact between mother and father, and I did anyway. I believe that I have narrowly tailored that relief to be appropriate so that there is a greater exchange of information that can flow.

Now, with regard to the substantive relief, . . . I understand [Father]'s dissatisfaction with the numerous rulings of this court and the appellate courts with regard to what's going on here, but I disagree that the compelling state interest of maintaining the safety of these children, given the act that has been found, and taking into account the proof of Nan Buturff, the children's therapist who says the risk of harm to the children from resuming a relationship with [Father] at this point in time is greater than the risk of harm to them from . . . continuing to deny them the society of their father, weighs against doing it.

In addition, there was testimony between the experts regarding – to go into the psychosexual evaluation that I found that is set out in my opinion, and I have not changed my mind and I do not believe that there was, as Dr. Alder indicated, a complete openness.

There is no showing on [Father]'s part how he would address the disparity between his adamant insistence that he did nothing wrong and the Court's numerous findings at Juvenile Court, at a trial de novo with this Court, and affirmed by the Court of Appeals, that there was, in fact, inappropriate contact involving one of these minor children. And until the issues regarding [Father]'s attitude and some of those things are resolved, this Court simply cannot find that the reasonable

likelihood of further harm to the children from a relationship does not exist.

On August 29, 2017, the trial court entered an order denying Father's May 31, 2017, motion to alter or amend the judgment, in which he argued for the first time that the no contact orders violated due process. Father thereafter filed a timely notice of appeal.

## II. ISSUES

Father raises the following issues on appeal:

1. The order prohibiting Father from having any contact with his children violates substantive due process.

2. The order prohibiting Father from contacting Mother is unlawful and violates procedural and substantive due process.

3. The trial court applied the wrong legal standards in deciding whether to vacate the existing order.

4. The trial court applied the wrong legal standards in deciding whether to modify the existing order.

5. The trial court erroneously failed to take judicial notice of important facts as required by Rule 201 of the Tennessee Rules of Evidence.

6. The trial court's decision constitutes an abuse of discretion, and the evidence preponderates against the trial court's decision.

## III. STANDARD OF REVIEW

This court reviews a trial court's denial of a motion for relief from a judgment made pursuant to the Rules of Juvenile Procedure under an abuse of discretion standard. *In re M.J.H.*, No. W2012-01281-COA-R3-JV, 2013 WL 3227044, at *10 (Tenn. Ct. App. June 25, 2013). A court abuses its discretion when it (1) applies incorrect legal standards; (2) reaches an illogical conclusion; (3) bases its decision on a clearly erroneous assessment of the evidence; or (4) employs reasoning causing injustice to the complaining party. *Discover Bank v. Morgan*, 363 S.W.3d 479, 487 (Tenn. 2012). "The

- 13 -

abuse of discretion standard does not permit an appellate court to merely substitute its judgment for that of the trial court." *Id.* (quotations and brackets omitted).

A court takes judicial notice when it accepts, "without requiring . . . proof . . . a well-known and indisputable fact," *State v. Lawson*, 291 S.W.3d 864, 868 (Tenn. 2009), the knowledge of which "is so notorious that everyone is assumed to possess it." *Smith v. State*, 607 S.W.2d 906, 907 (Tenn. Crim. App. 1980). Resort to judicial notice is further limited by Tennessee Rule of Evidence 201, which provides that "[a] judicially noticed fact must be one not subject to reasonable dispute, in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *Id.*

## IV. DISCUSSION

### Petition to vacate/modify

Father seeks review of the trial court's denial of his petition to vacate or modify the adjudicative and dispositional orders entered by the trial court in 2014. These orders are not in the record. Accordingly, we are precluded from proper review. *See Chiozza v. Chiozza*, 315 S.W.3d 482, 492 (Tenn. Ct. App. 2009); Tenn. R. App. P. 24. Father has waived his right to appeal the trial court's decision to deny him relief by failing to include in the record the judgment from which he sought to be relieved. *See Kelly v. Kelly*, No. M2015-01779-COA-R3-CV, 2016 WL 6124116, at *6 (Tenn. Ct. App. Oct. 19, 2016); *see* also, *Williams v. Williams*, 286 S.W.3d 290, 297 (Tenn. Ct. App. 2008) ("The failure of the appellant to ensure that an adequate transcript or record on appeal is filed in the appellate court constitutes an effective waiver of the appellant's right to appeal."). We are "precluded from addressing an issue on appeal when the record fails to include relevant documents." *State v. Zirkle*, 910 S.W.2d 874, 884 (Tenn. Crim. App. 1995). Without an adequate transcript, we "must presume that every fact admissible under the pleadings was found or should have been found in the appellee's favor." *McDonald v. Onoh*, 772 S.W.2d 913, 914 (Tenn. Ct. App. 1989).

Despite the condition of the record on appeal, when viewed in conjunction with the facts as set out in our prior opinion, we find support for the trial court's decision to deny Father's petition to vacate or modify.

### Law of the case

An appellate opinion becomes "the law of the case when a case is remanded for further proceedings." *Gray's Disposal Co., Inc. v. Metro. Gov't of Nashville*, 318 S.W.3d 342, 348 (Tenn. 2010). Under the "law of the case" doctrine, "an appellate court's decision on an issue of law is binding in later trials and appeals of the same case if the

facts on the second trial or appeal are substantially the same as the facts in the first trial or appeal." *Memphis Publ'g Co. v. Tenn. Petroleum Underground Storage Tank Bd.*, 975 S.W.2d 303, 306 (Tenn. 1998) (citing *Life & Cas. Ins. Co. v. Jett*, 133 S.W.2d 997, 998099 (Tenn. 1939); *Ladd v. Honda Motor Co., Ltd.*, 939 S.W.2d 83, 90 (Tenn. Ct. App. 1996)). Adhering to the doctrine "promotes finality and efficiency in litigation, ensures consistent results in the same proceeding, and assures that lower courts follow the decision of higher courts." *Gray's Disposal Co.*, 318 S.W.3d at 348 (citing *State v. Jefferson*, 31 S.W.3d 558, 561 (Tenn. 2000); *Harrison v. Laursen*, 128 S.W.3d 204, 208 (Tenn. Ct. App. 2003)).

We have held that the "law of the case" doctrine operates as a bar against extraordinary relief, such as that sought under Rule 60 during the proceedings on remand. *Tindell v. West*, No. E2012-01988-COA-R3CV, 2013 WL 6181997, at *4 (Tenn. Ct. App. Nov. 25, 2013). Father's grounds for relief were previously addressed on appeal, and to the extent that they were not, are waived for failure to be raised during the original trial or upon the first appeal.[3] *See Tindell*, 2013 WL 6181997, at *6 (finding that issues raised by appellants in a Rule 60.02 motion for extraordinary relief filed during the proceedings on remand from on earlier appeal were waived "either by failing to raise them at trial, or by failing to raise them on the first appeal.").

There are exceptions to the "law of the case" doctrine when: (1) the evidence offered following the remand is substantially different from that in the earlier proceeding; (2) the prior decision was clearly erroneous and would result in manifest injustice if allowed to stand; or (3) the prior decision is contrary to a change in the controlling law. *Gray's Disposal Co.,* 318 S.W.3d at 348. Father's arguments are worded to meet these exceptions, but all of them are meritless. As noted by the State, regarding exception (1), Father's only "newly discoverable" evidence was a single statement by the Child that "maybe he put medicine on me." This statement is not "substantially different" from the evidence Father previously introduced in support of his defense that he was engaging in "normal parenting behavior." Regarding exception (2), the prior decision was not "clearly erroneous," as demonstrated by our prior opinion, and as to exception (3), Father's argument that the trial court may no longer make no contact orders under section 73-1-152 is unavailing, as the provision authorizes "grant[ing of] injunctive relief upon such terms as the court may deem proper."

As our judgment in *In re Emmalee O.* is "the law of the case," the trial court may not disturb it. Thus, the trial court did not abuse its discretion by denying that portion of Father's petition seeking to vacate the prior orders.

---

[3]Father likewise waived his argument that the no contact orders violate due process by failing to raise it during trial or the first appeal.

## Changed circumstances

Under Tennessee Code Annotated section 37-1-139(b), "an order of the court may be changed or modified . . . upon a finding of changed circumstances and that the change or modification is in the best interest of the child." Tennessee Rule of Juvenile Procedure 310(a)(3) similarly provides that an order made in the course of a dependency-and-neglect proceeding "may be modified on the ground that, since the entry of the order, changed circumstances and the best interest of the child require it."

The final dispositional order specifically provided that Father may file a petition to modify the no contact order subject to the requirements that he:

> (1) [] complete a psycho-sexual evaluation administered by a qualified evaluator or provider approved by the Tennessee Sex Offender Board, (2) [] provide DCS with the identity of the evaluator in a timely fashion to enable DCS to provide the evaluator with necessary information to initiate and complete the required psycho-sexual evaluation, (3) [] engage and cooperate with any recommended treatment from the psycho-sexual evaluation, and (4) [] authorize the release of the psycho-sexual evaluation and treatment records to DCS[.]

Father raised the following justifications for modifying the no contact order: (1) that he had complied with the dispositional order by obtaining a psychosexual evaluation, which indicated he was a low risk to reoffend; (2) that the CASA volunteer appointed by the juvenile court recommended visitation; and (3) that the children were "suffering irreparable harm" by being separated from Father.

In reviewing Father's requested relief, the trial court properly utilized the standard established by Tennessee Code Annotated section 36-6-301 for granting visitation to noncustodial parents:

> After making an award of custody, the court shall, upon request of the noncustodial parent, grant such rights of visitation as will enable the child and the noncustodial parent to maintain a parent-child relationship *unless the court finds, after a hearing that visitation is likely to endanger the child's physical or emotional health. . . . If the court finds that the noncustodial parent has physically or emotionally abused the child, the court may require that visitation be supervised or prohibited until such abuse has ceased or until there is no reasonable likelihood that such abuse will recur. . . .*

- 16 -

(Emphasis added). We have previously upheld the trial court's determination that Father committed sexual abuse against the Child. *In re Emmalee O.*, 464 S.W.3d 311. Thus, the trial court properly found that Father had "physically or emotionally abused" the children, giving it express statutory authority to prohibit visitation "until there is no reasonable likelihood that such abuse will recur." Tenn. Code Ann. § 36-1-301.

## Psychosexual evaluation

Father requested that the trial court take judicial notice of several statements relating to the "Static-99," described by Mr. Stanley as "a rapid risk assessment of sexual offense recidivism" developed in Canada. Since 1990, judicial notice of adjudicative facts has been governed by Rule 201 of the Tennessee Rules of Evidence. A judicially noticed fact must be one that is not subject to reasonable dispute. Tenn. R. Evid. 201(b). It must be either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. Tenn. R. Evid. 201(b). The "facts" Father presented for judicial notice related to blanket conclusions about recidivism rates and Father's own score on the assessment. As argued by the State, facts about Canadian sex-offender risk assessments – especially those relating to an individual score – are not "generally known." *See* Tenn. R. Evid. 201. Likewise, we cannot conclude that the Canadian government's website – Father's alleged source for these facts – is so unquestionably reliable to the point that anything found there is incapable of "reasonable dispute." *Id.* Accordingly, the trial court did not err by failing to take judicial notice of the Static-99 facts.

Father further argued his psychosexual evaluation proved that "there is zero risk [Father] would sexually abuse anybody." However, Mr. Stanley explained that the risk assessment instruments he employed in Father's evaluation were "based upon previous criminal history and sexual convictions, of which [Father] had none." It appears that he believed there had been no legal finding that Father had committed any type of sexual offense:

> My understanding was it's a civil court and their language that orders are written in a lot of times have in the beginning, or very close to the beginning, "in the opinion of this court." Okay? An opinion is different in my eyes, okay. I don't work within the legal system. An opinion is different than a judicial finding, court order. So, you know, if that's an error on my part, I apologize.

Both Dr. Adler and Ms. Buturff agreed that the Static-99 risk assessment was inappropriate to use on Father, and Dr. Adler discussed how Mr. Stanley's evaluation

failed to comply with best practice standards established by the Tennessee Board of Sexual Offender Treatment Providers:

It was based solely on Father's self-report with no consideration of corroborating or contradictory collateral evidence.

The instruments Mr. Stanley used to measure Father's re-offense risk (the Rapid Risk Assessment of Sexual Offense Recidivism [RRASOR], Static-99, and Bays and Freeman-Longo) were outdated, unreliable or invalid, and not recommended by the Board.

The personality assessment inventory (the PAI) had "nothing to do with risk to re-offend."

It failed to measure deviant sexual interest -- "the single most significant factor" to predicting recidivism.

The report failed to include the Child's disclosures of sexual abuse despite research demonstrating that such young children are "generally the best and most reliable source for what happened."

Mr. Stanley dismissed the abuse as "allegations" and failed to consider the trial court's finding of sexual abuse as affirmed on appeal.

In Dr. Adler's eyes, the most significant issue with Mr. Stanley's evaluation was Father's refusal to provide information about his sexual behavior and the brevity of Father's one-paragraph sexual history. Dr. Adler noted that such information would normally be five to ten pages for a man of Father's age.

So if the whole purpose for me is to assess what you need from a treatment standpoint or assess what kind of problems you might be at risk to have, I would need to know the sexual history pretty in depth to make those kinds of conclusions . . . So just from that alone, *this isn't a psychosexual evaluation*, among the other problems that we have.

(Emphasis added.).

Dr. Adler concluded that the evaluation's numerous deficiencies rendered it insufficient to support any finding about Father's risk to reoffend. He further disagreed with Mr. Stanley's conclusion that Father "would be an excellent candidate for a revision/amendment to the current child custody visitation order." According to Dr. Adler, before recommending contact with a perpetrator of abuse, approved treatment providers must first satisfy "very specific" Board-mandated guidelines designed to avoid retraumatizing the victim - a risk during even supervised visitation. The guidelines require that (1) the perpetrator acknowledge and take responsibility for the offense and that (2) the victim be strong and stable enough to recognize that they were not at fault for their abuse. It is clear that Mr. Stanley's report failed to demonstrate that either condition had been met. Accordingly, the trial court properly dismissed Mr. Stanley's evaluation as "unreliable."

Additionally, the trial court properly dismissed the CASA volunteer's recommendation to move toward supervised visitation, as she admitted to no expertise or training with regard sexual abuse issues and relied "strictly" on the conclusions of Mr. Stanley's discredited evaluation in making her recommendation. Further the trial court did not err by concluding that Father had failed to establish a "cause and effect relationship" between the Child's emotional and behavioral problems and his absence from their lives. Ms. Buturff opined from her six years of counseling the Child that the emotional and behavioral issues were primarily the result of Father's sexual abuse and, more recently, the death of the maternal grandfather. Ms. Buturff recommended against visitation.

The evidence before us on this appeal reveals that contact with Father at this time would not be in the best interests of the children. Accordingly, the trial court did not abuse its discretion by denying that part of Father's petition seeking to modify the no contact order.

## V. CONCLUSION

The judgment of the trial court is affirmed and this cause is remanded to the trial court for collection of the costs below. The costs on appeal are assessed against the appellant, Alan O.

_____
JOHN W. MCCLARTY, JUDGE

- 19 -