# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs November 2, 2020

## IN RE CRYSTAL W. ET AL.

### Appeal from the Fourth Circuit Court for Knox County
### No. 140542        Gregory S. McMillan, Judge

___

### No. E2020-00617-COA-R3-JV

___

In this dependency and neglect action, the mother appealed the determination made by the Knox County Juvenile Court ("juvenile court") that the two minor children at issue were dependent and neglected to the Knox County Circuit Court ("trial court"). The father of the children had initiated the action by filing a petition for dependency and neglect against the mother in the juvenile court, alleging, *inter alia*, the mother's inability to properly care for the children due to ongoing mental health issues. The Tennessee Department of Children's Services ("DCS") had intervened in the juvenile court proceedings, and following entry of an adjudicatory order, the juvenile court had awarded legal and physical custody of the children to the father. In a separate proceeding not at issue in this appeal, the juvenile court subsequently awarded temporary custody of the children to the paternal grandfather and step-grandmother. Following a *de novo* bench trial on the mother's appeal, the trial court determined that the children were dependent and neglected as to the mother and maintained custody of the children with the paternal grandfather and step-grandmother. The mother has appealed to this Court.[1] Discerning no reversible error, we affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and KENNY W. ARMSTRONG, J., joined.

Mary Ward, Knoxville, Tennessee, for the appellant, Wanda P.

Herbert H. Slatery, III, Attorney General and Reporter, and Jordan K. Crews, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

___

[1] Although the father testified at trial, he filed a statement with this Court during the pendency of the appeal that he is not participating in the appeal.

**OPINION**

**I. Factual and Procedural Background**

This case focuses on two minor children, Crystal W. and Jennifer W. ("the Children"), born to Wanda P. ("Mother") and Thomas W. ("Father"), who were never married to each other. On March 21, 2016, Father filed a petition in the juvenile court, requesting that the court find the Children, who were respectively seven and five years of age at the time, dependent and neglected as to Mother and grant Father "legal care and custody." The parents had undisputedly separated and ended their relationship earlier in 2016. In his petition, Father averred that Mother had "ongoing mental health issues," exhibited "erratic behavior," and did not consistently take needed medication. He also averred that Mother did not have a stable home and that he was concerned for the Children's safety. Father attached to his petition copies of an admission assessment and discharge summary reflecting that Mother had been hospitalized at Peninsula Hospital ("Peninsula") from March 9, 2016, through March 18, 2016, for mental health reasons.

The juvenile court subsequently appointed attorney Anna E. Corcoran as guardian *ad litem* ("GAL") to represent the Children.[2] On April 13, 2016, the GAL filed an emergency *ex parte* motion, alleging that the Children were dependent and neglected as to Mother and requesting that they be placed in "the temporary legal and physical custody" of Father. Incorporating the allegations in Father's petition by reference, the GAL argued that it was in the best interest of the Children to be removed from Mother's custody based on, *inter alia*, Mother's "unresolved mental health issues" and "recent arrests." Reporting that she had "observed a safe and appropriate home, and that the Children were happy and appeared well cared for by Father," the GAL asserted that it was in the best interest of the Children to be placed with Father. The GAL also requested in her *ex parte* motion that Mother be ordered to have no contact with the Children pending a hearing.

The juvenile court immediately entered an "Ex-Parte Temporary Restraining Order," awarding temporary physical custody of the Children to Father and prohibiting Mother from removing the Children from Father's custody. The juvenile court also directed that prior to the preliminary hearing on Father's petition, Mother could have visitation with the Children, provided that the visits were supervised by Father or a third party designated by Father.

---

[2] Magistrate Michael W. Fortune presided over the juvenile court proceedings with Judge Timothy E. Irwin ultimately entering an order confirming the magistrate's rulings. For ease of reference in this opinion, we will refer to the magistrate's findings and orders as those of the "juvenile court."

On April 18, 2016, DCS, through case manager Gary Honaker, filed a motion to intervene and also requested that the juvenile court find the Children to be dependent and neglected as to Mother and award temporary legal custody of the Children to Father. Specifically alleging that the Children were dependent and neglected because of Mother's "mental health issues, homelessness, and overall instability," DCS requested that Mother be granted only "supervised contact" with the Children and that Father be directed to ensure that Mother's visits were supervised.

In its motion to intervene, DCS averred that it had received a referral alleging environmental neglect in Mother's home on March 7, 2016, and that Mother had been admitted to Peninsula a few days later. Noting in its motion that Mother had been released from Peninsula on March 20, 2016, DCS further averred that after attempting to visit Mother at a "new address" that she had provided, Mr. Honaker was subsequently informed by Mother that she had vacated that residence when she and the residence's owner had argued and law enforcement had been called. Mother had then undisputedly sought shelter at Knox Area Rescue Ministries ("KARM"). According to DCS, Mother subsequently missed a meeting with Mr. Honaker when she was arrested on March 28, 2016, and charged with assault following an incident when Mother sat in a stranger's vehicle in a parking lot and bit the vehicle's owner on the thigh when the owner tried to physically remove her. As evinced by a judgment presented as an exhibit in the trial court, Mother pled guilty in the Knox County General Sessions Court ("general sessions court") to the assault charge stemming from the March 28, 2016 incident, and the general sessions court sentenced her to eleven months, twenty-nine days, suspended.

Following a hearing conducted on April 21, 2016, at which Mother did not appear, the juvenile court entered an interim order the same day, finding probable cause that the Children were dependent and neglected as to Mother and awarding physical custody of the Children to Father. The juvenile court appointed Mother's former counsel to represent her in the juvenile court proceedings. In a subsequent order entered on June 20, 2016, the juvenile court made further findings of fact, including that the Children were dependent and neglected as to Mother "due to the mental health issues, lack of stable housing, and substance abuse issues of [Mother], along with [Mother's] inability to provide appropriate care and supervision." The juvenile court noted that this finding was made without prejudice to Mother because it was "unclear whether [Mother] had notice of this proceeding." Again awarding "temporary legal and physical custody" of the Children to Father, the juvenile court granted Mother supervised visitation to be conducted by Parent Place, a third-party agency. The juvenile court also directed Mother to, *inter alia*, undergo a mental health assessment and an alcohol and drug assessment and follow all resultant recommendations, execute releases for DCS and the GAL, "secure safe and appropriate housing" and a "legal source of income," maintain consistent visitation with the Children, and refrain from harassing or engaging in "verbal

or physical conflict" with Father. Following a subsequent hearing conducted on August 30, 2016, the juvenile court entered additional interim orders confirming the probable cause determination and the Children's placement in Father's physical custody.

The juvenile court conducted an adjudicatory hearing on January 31, 2017, and entered an order the same day, finding by clear and convincing evidence that the Children were "in the protective jurisdiction" of the juvenile court pursuant to the statutory definition of a dependent and neglected child, *see* Tenn. Code Ann. § 37-1-102(b)(13), and awarding "physical and legal custody" of the Children to Father. In an adjudicatory order entered on June 7, 2017, the juvenile court specifically stated that the finding of dependency and neglect was based upon Mother's "unresolved mental health issues, lack of stable housing, and inability to provide appropriate care and supervision." Upon a notice of appeal filed by Mother, the juvenile court judge confirmed the magistrate's findings in an order entered on June 27, 2017, and directed the court clerk to prepare and forward the record to the trial court for a "trial de novo."

Following notice to the parties and with no pleadings having been filed in the trial court related to the appeal from the juvenile court's judgment, the trial court entered an order dismissing the appeal on January 3, 2018. Mother, acting without benefit of counsel, then filed a timely notice of appeal with this Court, seeking review of the dismissal order. Upon this Court's subsequent order of remand, notice filed by DCS that it had contacted Mother and discovered that she was involved in pending matters in the juvenile court and was represented there by her current counsel, and Mother's filing of an affidavit of indigency, the trial court entered an order appointing Mother's current counsel to represent her in the trial court. Upon a subsequent joint motion filed by DCS, Mother, and the GAL, the trial court entered an agreed order on October 29, 2019, "reopen[ing] the dependency and neglect proceeding for de novo hearing."

The trial court conducted a bench trial on February 19, 2020, during which DCS called Mother as an adverse witness and presented testimony from Father; Dawn Smith, who had been Mr. Honaker's DCS supervisor during the case; and C.W., the Children's paternal step-grandmother ("Grandmother"). In addition to the judgment and guilty plea from the March 2016 assault incident, DCS also presented copies of Mother's admission and discharge summaries from Peninsula for the March 2016 hospitalization and a subsequent hospitalization spanning twelve nights in December 2017 to January 2018. Mother presented testimony from her uncle, R.P., and a friend, L.P., both of whom had observed Mother's interactions with a child, A.P., whom Mother had been babysitting, although neither had observed Mother's interactions with the Children.

The evidence demonstrated that by the time of trial, the Children had been residing with Grandmother and the Children's paternal grandfather (collectively, "Grandparents"),

since the fall of 2017. Grandmother testified that Crystal had come to live with Grandparents on September 29, 2017, when she became "rebellious" with Father and that Jennifer had joined her in Grandparents' home eight days later. It is undisputed that Grandparents obtained temporary custody of the Children through a separate juvenile court proceeding; however, no documentation of that proceeding is in the record before us. Father testified in the instant action that he had agreed to the award of temporary custody to Grandparents.

In an order entered on March 9, 2020, the trial court found the Children to be dependent and neglected as to Mother by clear and convincing evidence. The record on appeal does not include a written transcript of the February 2020 trial, but it does include a "DVD" audio and video recording of the entire proceedings that day, which was certified by the trial court clerk as official pursuant to Tennessee Supreme Court Rule 26. The trial court included in its judgment detailed summaries of the testimonies presented, and having reviewed the recording, we find these summaries to be substantively accurate, along with the trial court's corresponding descriptions of the exhibits presented. As relevant on appeal, the trial court made the following factual findings:

> Exhibit 1 is a certified copy of [Mother's] guilty plea to assault in [the general sessions case]. In March 2016, [Mother], without permission of the vehicle owner, entered a car located in the parking lot of a local fast-food restaurant. When the owner of the vehicle (who did not know and is unrelated to [Mother]) came out of the restaurant, [Mother] refused to leave the vehicle. When the victim attempted to physically remove [Mother], she bit the vehicle owner on the right thigh. The arrest warrant states that [Mother] appeared "highly intoxicated on an unknown substance and was in a daze." On April 7, 2016, [Mother] pleaded guilty to the assault charge. At trial, [Mother] asserted that she had been trying to talk to the vehicle owner and that the vehicle owner "started in on me" and that she "didn't do anything." At trial, [Mother] also denied knowing that she pleaded guilty and, after being shown Exhibit 1 (which contains her signature to accept her guilty plea), simply repeated, that she "didn't know that [she] pled guilty."

> Exhibit 2 is comprised of records from [Peninsula]. The records in Exhibit 2 relate to [Mother's] two most recent hospitalizations for mental health treatment. The older of the records is from March 2016, following the arrest discussed above. At that time, [Mother] stated to Peninsula's intake staff that "she [was] doing well and [did] not have any problems and should not have been [there]." As part of her intake interview, [Mother] made several statements leading the Peninsula staff to conclude that she

was "very delusional." These statements include[d] that, while she was at University of Tennessee Medical Center ("UTMC") after her arrest, UTMC had performed surgery on her to remove her baby and that she had been sexually assaulted by the security guards while at UTMC.

At trial in 2020, [Mother] still believed that her son, Gabriel, was taken by UT Hospital in 2016. [Mother] testified that she based this belief on two events – the first being Peninsula originally telling her upon admission (in 2016) that she was pregnant and then later (in course of same admission) telling her she was not pregnant. The second reason for [Mother's] belief that she had a son was that "God had told her that her son, Gabriel, had been taken from her."

The more recent of the Peninsula records is from a hospitalization in late December 2017. On December 27, 2017 [Mother] was found wandering in the middle of the road. Before being taken into custody and placed in an ambulance, she had been observed walking into traffic and talking to herself. The ambulance took her to UT Hospital where she was assessed by Helen Ross McNabb Center Mobile Crisis Unit. After their evaluation, she was brought to Peninsula. Upon initial arrival at Peninsula, [Mother] told three different versions of how she came into treatment.

Upon admission to Peninsula in December 2017, [Mother] again reported that she had a child "who will be two years old in March." [Mother] stated that the child she is talking about was the "one you all took out of me the last time I was here, and I have never seen it, you all put it straight into state custody." [Mother] was treated at Peninsula for over a week. She was released from Peninsula on January 9, 2018.

[Mother's] records from her second hospitalization at Peninsula indicate that she was jailed in November 2017 and was not able to attend outpatient treatment since October 2017. Upon discharge on January 9, 2018, [Mother's] diagnosis was Bipolar Disorder, current episode was manic with psychosis. The discharge notes state that [Mother] was "pleased with her progress and anticipate[d] compliance with aftercare as arranged by case management upon discharge."

* * *

At trial in this Court, [Mother] was asked if she had a history of mental illness. Her answer was, "[t]hat's what they say – I don't believe

it." Her medical records indicate that she has had over 30 hospitalizations since she was a teenager, and she confirmed this number of interventions at trial. She testified without contradiction that she was currently attending outpatient treatment at Peninsula for monthly medication monitoring. She has a case manager, but she is not receiving any other mental health services such as counseling. [Mother] stated that she takes her medication but believes that she "doesn't need it." She further indicated that she only takes her medication because she was told she had to in order to have her children back.

[Mother] testified that she babysits a young boy named [A.P.] . . . . She has provided care for him since he was four or five years old, and now provides after-school care for him while his parents work. While most of her time with him ends by dinner time or in the evening, [A.P.] has stayed with her twice overnight. [Mother] testified that, at some point between November 2019 and January 2020, she had some involvement with the police while [A.P.] was in her care. She testified that while [A.P.] and she were out, she ran out of gas. The police stopped to check on her. After speaking with her, the police called [A.P.'s] parents (who came for him), and then [Mother] was allowed to leave once a friend brought her money to pay for gas.[3]

[Mother] also testified about a recent assault she suffered in December 2019. [Mother] indicated that she met a man who was "on the property" where she lives. She first met this man on December 9, 2019. She was trying to be friendly and struck up a conversation with him. In a confusing and hard-to-follow recitation of events, [Mother] testified that, after meeting this man and talking with him, she had asked him not to show up [at her apartment] "because he had shown up before." On December 12, 2019, this man (whose name she does not know) came to her apartment door at approximately 11:00 p.m.[4] [Mother] acknowledged that when she answered the door, she could tell he was intoxicated. [Mother] testified that he wanted a ride to the Whittle Springs area of Knoxville. [Mother], who wanted to go out and get cigarettes, agreed she would take him. Despite

---

[3] As Mother notes on appeal, Mother testified that she took A.P. home to his parents once she obtained the gasoline. However, in a somewhat jumbled account concerning several incidents, Mother also testified that when she was hospitalized for a few days in "January 2019 or November 2018," she had A.P. at the hospital with her while she visited a friend and that when she could not find her keys or the elevator, she was involuntarily committed. Mother stated that during this incident at the hospital, A.P.'s parents were called and that he stayed with officers until his parents arrived.

[4] As DCS notes, Mother actually stated that the man entered her home at approximately 1:00 a.m.

only knowing him for three days, having asked him not to just drop by, and despite her observation that he was intoxicated, she allowed him into her apartment while she got ready to go. Once they got in the car, [Mother] testified that they began to argue about which way to go, he became violent, and he hit her. She testified that she made him get out somewhere around Summit Hill Drive, and then she drove away. [Mother] subsequently became lost and had to call the police for assistance because she did not know where she was. In addition to being lost, [Mother] needed the officer to turn her car around because she was unable to do it herself. [Mother] indicated that her injuries were severe enough that the responding officer wanted her to be transported by ambulance, which she refused. [Mother] then refused to have a wound in her mouth sutured when she was seen by a medical provider.

When asked about this event and other events involving altercations with other people, [Mother] testified that she does not have problems with people until they "start in on me." Later in her testimony, [Mother] stated that she was "only not okay if people are up in my face, badgering me." [Mother] has apparently had numerous physical altercations with other people. In her testimony and in her records from Peninsula there were references to her having been beaten up by her mother. [Mother] testified to having contact with the police at the hospital because she was lost and could not find her keys, and that she was admitted for two to three days simply because she had lost her keys and was wandering "looking for the elevator." [Mother] could not provide a date for this hospitalization beyond denying that it was "last year." [Mother] also testified about an altercation with the Crossroads or Knox Area Rescue Mission staff and/or a law enforcement officer. On that occasion, [Mother] said that she was simply trying to speak to the advocate and get her belongings, and then became frustrated and threw her phone onto a table because the "officer was in my face."

[Father] testified about the circumstances that originally led to the children being removed from [Mother's] home. He testified about the condition of the home and [Mother's] failure to see to the children's needs. In addition, he testified that he had seen her "get ill when someone was up in her face . . . [and] she lays hands on people." He also testified that [Mother's] reaction to the girls acting up was to tell them to "shut up/be quiet."

[Mother] called two witnesses on her behalf. [L.P.] has known [Mother] "since last year." They met through a mutual friend. [L.P.] has observed [Mother] interacting with [A.P.]. In addition, [L.P.] has observed [Mother] interacting with her own children (ages 13 and 15). [L.P.] indicated that she had no concerns for the children in this case being with [Mother], based upon her interactions with [Mother] and her observations of [Mother] with [A.P.] and her own children. [L.P.] testified that she does remind [Mother] occasionally to take her medications. [L.P.] was aware of the December 2019 incident in which [Mother] was struck by the man [Mother] was driving to Whittle Springs. [L.P.] got all her information about the incident from [Mother]. She had not been told that [Mother] had invited the man into her apartment before being assaulted in the car.

The second witness was [Mother's] uncle, [R.P.]. [R.P.] sits with [Mother's] father (who suffered a brain injury after being hit by a baseball bat). He testified that he sees [Mother] regularly ("[o]ne time a week, sometimes more than that."). In his opinion, she's a "good girl and good momma." His opinion was impeached by his testimony that he has not had the opportunity to observe her with her daughters. His opinion was also impeached by the fact that he only knew [Mother] "until she was adopted out" of his brother's household. His answer indicates that his observations of her would necessarily have been before she reached majority and before the recent past. [R.P.] did not know that [Mother] had allowed an intoxicated man into her home in December 2019.

[Mother] receives SSI [Supplemental Security Income] in the amount of $783.00 per month. She pays $600.00 to rent her one-bedroom apartment.[5] Her other expenses include car insurance of $70.00 per month, her phone bill of approximately $65.00 per month and renters' insurance of $11.00 per month. She did not testify regarding her groceries, clothing, or medical expenses.[6] [Mother] indicated that, if the girls were returned to her or were permitted to spend the night, they could have the bedroom and she would take the couch in the other room (combined living room and kitchen area). There was no proof of any benefits received by the

---

[5] As DCS acknowledges, Mother testified that the total monthly rent for her apartment was $901.00 but that she only paid $221.00 monthly with the federal Department of Housing and Urban Development ("HUD") paying the remainder.

[6] Mother did testify that she paid $3.00 monthly for the cost of some of her medications and $1.50 monthly for others.

children or how [Mother] intended to obtain housing suitable for herself and her children, or provide for their clothing, food, etc.

The children are currently living with their paternal grandparents. [Grandmother] testified that the girls are both honor roll students and getting awards at their schools. [Jennifer] has made progress on her educational delays, although she still is slow in speech and continues to work to better comprehend spoken language. [Jennifer] also has scoliosis and a heart murmur. [Jennifer] is being treated and followed appropriately for both of these conditions. Both children have been diagnosed with ADHD [Attention Deficit Hyperactivity Disorder] and [Crystal] has a diagnosis of defiance disorder. When the children were first removed from [Mother's] care in 2016, they were in therapy. The therapy lasted approximately two years and was discontinued due to the progress the girls had shown.

[Mother's] medical records and her own testimony establish that she does not trust medical providers and emergency responders. At trial, she testified that she would take the girls for their necessary treatment. She qualified her appropriate answer by saying that she goes to ". . . doctors I trust." When asked how she makes that determination, she answered "I can sense who that is. I can sit there and tell if they'll be good by how they act."

(Paragraph numbering omitted.)

The trial court also found that although Mother had not seen the Children since the fall of 2018 and Parent Place had "dropped" Mother due to missed visits, "[a] combination of events" led to Mother's poor attendance at visits, including Mother's illness, hospitalization, and time spent in custody. Finding that "some of the circumstances were beyond [Mother's] control," the trial court requested that "[i]f it is at all possible, [Mother] should be given a second chance." The trial court directed that "[i]f Parent Place will not re-enroll [Mother] for visitation, [Mother] may petition the Juvenile Court for a substitute supervising agency or an appropriate third-party to supervise her co-parenting time." The trial court directed, however, that given Grandmother's testimony concerning past negative changes in the Children's behaviors immediately before and after visits with Mother, the Children must "be returned to therapy to prepare them for the resumption of [Mother's] Parent Place co-parenting time."

The trial court incorporated several directives from the juvenile court's adjudicatory order concerning requirements for visitation with the Children. Included in these directives was a requirement that in order to obtain unsupervised visitation with the Children in the future, Mother would have to file a petition with the juvenile court seeking a modification. With that petition, Mother would have to provide proof of her compliance with several requirements, including, *inter alia*, "psychological assessment and follow up on the treatment and recommendations of that assessment until treatment is no longer deemed necessary by the mental health provider." Mother timely appealed the trial court's dependency and neglect finding to this Court.

## II. Issue Presented

Mother presents one issue on appeal, which we have restated slightly as follows:

Whether the trial court erred in finding by clear and convincing evidence that the Children were dependent and neglected as to Mother.

## III. Standard of Review

Our review of the trial court's judgment following a non-jury trial is *de novo* upon the record, with a presumption of correctness as to the trial court's findings of fact unless the preponderance of the evidence is otherwise. *See* Tenn. R. App. P. 13(d); *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 204 (Tenn. 2012). "In order for the evidence to preponderate against the trial court's findings of fact, the evidence must support another finding of fact with greater convincing effect." *Wood v. Starko*, 197 S.W.3d 255, 257 (Tenn. Ct. App. 2006) (citing *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 296 (Tenn. Ct. App. 2001)). We review questions of law, including those of statutory construction, *de novo* with no presumption of correctness. *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000) (citing *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 924 (Tenn. 1998)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Morrison v. Allen*, 338 S.W.3d 417, 426 (Tenn. 2011); *Jones v. Garrett,* 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). However, "[a]lthough this right is fundamental, and superior to claims of the government and other persons, it is not absolute." *In re H.L.F.*, 297 S.W.3d 223, 232 (Tenn. Ct. App. 2009) (citing *State v. C.H.K.,* 154 S.W.3d 586, 589 (Tenn. Ct. App. 2004)). Considering the fundamental nature of the right involved, "[a] determination that a child is dependent and neglected must be supported by clear and

convincing evidence." *See In re Emmalee O.*, 464 S.W.3d 311, 323 (Tenn. Ct. App. 2015) (quoting *In re Kaitlynne D.*, No. M2013-00546-COA-R3-JV, 2014 WL 2168515, at *1-2 (Tenn. Ct. App. May 21, 2014)). Our Supreme Court has defined clear and convincing evidence as "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992). The issue of whether dependency and neglect have been established is a matter of law. *In re H.L.F.*, 297 S.W.3d 223, 233 (Tenn. Ct. App. 2009).

IV. Dependency and Neglect Adjudication

Mother contends that the trial court erred in finding by clear and convincing evidence that the Children were dependent and neglected, particularly given Mother's situation at the time of the *de novo* trial. DCS contends that the trial court properly considered Mother's situation at the time of the *de novo* trial together with all facts in the record. Upon thorough review of the record and applicable authorities, we agree with DCS.

The trial court found that the Children were dependent and neglected pursuant to the statutory definition, specifically the following subsections of what is now codified at Tennessee Code Annotated § 37-1-102(b)(13) (Supp. 2020),[7] defining a dependent and neglected child as one:

   (B)    Whose parent, guardian or person with whom the child lives, by
          reason of cruelty, mental incapacity, immorality or depravity is unfit
          to properly care for such child;


   * * *


   (D)    Whose parent, guardian or custodian neglects or refuses to provide
          necessary medical, surgical, institutional or hospital care for such
          child;


   * * *

---

[7] At the time of the petition's filing in the instant action, the definition of a dependent and neglected child was codified at Tennessee Code Annotated § 37-1-102(b)(12) (2014), which was the version cited by the trial court in its judgment. Effective July 1, 2016, the General Assembly renumbered the applicable definition to subsection -102(b)(13) without any change to the statutory language at issue here. *See* 2016 Tenn. Pub. Acts, Ch. 979, § 4 (S.B. 2121).

(F)     Who is in such condition of want or suffering or is under such improper guardianship or control as to injure or endanger the morals or health of such child or others;

(G)     Who is suffering from abuse or neglect . . . .

As this Court has previously explained concerning circuit court review of a juvenile court's adjudication of dependency and neglect:

> The General Assembly vested juvenile courts with exclusive, original jurisdiction to determine whether a child is dependent and neglected. Tenn. Code Ann. § 37-1-103(a)(1) (2011). Under Tennessee Code Annotated § 37-1-159, an appeal from the juvenile court's decision on a dependency and neglect petition is to be heard by the circuit court. Tenn. Code Ann. § 37-1-159(a) (2016). This statute directs the circuit court to "hear the testimony of witnesses and try the case de novo." *Id.* The de novo hearing requirement directs the circuit court to determine whether the child is dependent and neglected as of the time of the new hearing. *In re Caleb L.C.*, 362 S.W.3d 581, 599 (Tenn. Ct. App. 2011) (citing *Green v. Green*, No. M2007-01263-COA-R3-CV, 2009 WL 348289, at *10 n.13 (Tenn. Ct. App. Feb. 11, 2009)). Accordingly, the circuit court must make a fresh determination based on the evidence presented. *Tenn. Dep't of Children's Servs. v. T.M.B.K.*, 197 S.W.3d 282, 289 (Tenn. Ct. App. 2006).

*In re Lukis B.*, No. M2016-00357-COA-R3-JV, 2017 WL 1103043, at *2 (Tenn. Ct. App. Mar. 24, 2017).

In determining that the Children were dependent and neglected as to Mother, the trial court summarized its findings as follows:

> By clear and convincing evidence, the Court finds that the minor children are dependent and neglected as defined by Tenn. Code Ann. § 37-1-102(b)(12)(B), (D), (F) and (G). [Mother] has a long-standing history of altercations with people whom she believes are challenging her or giving her a difficult time. She has shown an inability to control her reaction when challenged. In making this finding, the Court relies on [Mother's] long-standing history of mental health issues, her recurrent hospitalizations for stabilization, her having been convicted [in] 2016 for assault, her testimony about getting into an altercation with her own mother within the past two years, the incident in which she slammed or threw her [] phone

after an officer "got in her face," and the most recent altercation with an intoxicated man whom she let into her home and who then assaulted her after they argued in her car. These anger issues, coupled with [Mother's] failure to understand the severity of her mental health issues as shown by her belief that she does not need her prescribed medication and is only taking them because the Court has indicated it is necessary for her to get what she wants, establish that she is unfit to care for her children.

The Court finds that [Mother's] testimony about her lack of trust in medical providers and her unwillingness to seek appropriate treatment for herself (not getting stitches after the December 2019 assault) and not trusting doctors at the University of Tennessee Medical Center because "they took her baby," and her testimony that she can sense whether a doctor is "good" establish that she will not be able to provide necessary medical or emotional care for her children. [Father's] testimony about the condition of the home and [Mother's] inability to engage in the most basic housekeeping and provision of care for the children when they last lived together was not rebutted by [Mother's] testimony concerning her current living conditions. Included within the Court's determination under subsection (F) is [Mother's] failure to exercise appropriate judgment by allowing an intoxicated man whom she had only know[n] three days into her apartment and then agreeing to give him a ride (to the ["]Whittle Springs area" around midnight). By virtue of [Mother's] actions, her children have suffered abuse and neglect at the hands of their mother.

(Paragraph numbering omitted.)

Specifically, Mother argues that the trial court erroneously based its finding of dependency and neglect on (1) Mother's past situation rather than her situation at the time of the *de novo* trial, including her history of mental illness and purported inability to provide for the Children's housing needs, medical care, and other necessities; (2) Mother's conduct leading up to the December 2019 assault against her; and (3) Mother's expressed skepticism concerning the medical profession. We will address each of Mother's arguments in turn.

First, Mother asserts that the trial court failed to consider evidence that at the time of trial, she had a legal source of income, had "safe and appropriate" housing, was successfully babysitting A.P., and was receiving mental health treatment, including taking prescribed medications and cooperating with her Peninsula case manager. On the contrary, we note that the trial court included Mother's current Supplemental Security

Income ("SSI") income, housing situation, caretaking of A.P., and medication monitoring with her Peninsula case manager in its findings of fact.

As to income, Mother takes issue with the trial court's statement that "[t]here was no proof of any benefits received by the children or how [Mother] intended to obtain housing suitable for herself and her children, or provide for their clothing, food, etc." Mother cites to her own testimony that the Children received benefits and that she would be able to obtain food stamps if they were with her as proof. However, Mother did not indicate the amounts of such benefits and provided no documentation to support her claim. She also acknowledged that at the time of trial, she was babysitting A.P. without payment for doing so.

As to housing, Mother correctly posits that in determining whether restoring custody to a parent is in a child's best interest, DCS is by statute not permitted, with exceptions not demonstrated here, to require an individual bedroom for each child. *See* Tenn. Code Ann. § 37-1-166(h)(2) (2014). When the Children were removed from Mother's custody, she was without a stable home. She acknowledged at trial that she had vacated the address she provided to DCS after a disagreement with the home's owner and that she had then sought shelter at KARM. Commendably, by the time of trial, Mother had secured subsidized housing and had been living in a one-bedroom apartment for approximately nine months. She testified that she had two beds in the bedroom and that she could sleep on the couch if the Children were returned to her custody or if they visited her overnight. However, as DCS points out, Mother acknowledged that at the time of trial, she did not know the Children's current needs, and she offered no concrete plan for how she would meet their needs beyond her willingness to sleep on the couch so that the Children could have the bedroom. In reviewing the judgment, we do not find that the trial court imposed a requirement that each child must have her own bedroom if residing with Mother. Instead, the trial court considered Mother's housing situation as one of many facts to be weighed in determining whether Mother had the capacity to properly care for the Children.

The trial court also found that "[Father's] testimony about the condition of the home and [Mother's] inability to engage in the most basic housekeeping and provision of care for the children when they last lived together was not rebutted by [Mother's] testimony concerning her current living conditions." We recognize that to some extent, testimony concerning Mother's care of A.P. demonstrated that at the time of trial, Mother's ability to engage in providing daily care to a child had improved since the time period described by Father. However, as the trial court also found, A.P. had been with Mother during an incident when police were called after she had nearly run out of gas in her vehicle and parked in front of a business to contact a friend for funds. On appeal, Mother states that she simply ran out of gas and did nothing wrong. However, Mother

testified that she was "extremely tired" during this incident rather than "on drugs" as someone who had called officers had suspected, indicating that she was apparently so tired that she appeared to be under the influence of something. Mother also appeared to remain convinced at trial that when she had exited the interstate highway to park at the business, the other cars on the highway had been "driving over 100 miles per hour in all lanes." At the least, Mother's testimony indicates that she was overwhelmed during this incident.

Additionally, according to Mother's account of how she became involuntarily committed to Peninsula on one occasion, A.P. had been in her care during that incident as well when security officers called A.P.'s parents to retrieve him. Overall, the evidence concerning Mother's care of A.P. is neutral at best as an indication of her ability to provide care for the Children. Moreover, the trial court's factual findings in its judgment reflect that the court carefully considered Mother's interactions with A.P. as part of her current situation.

Concerning Mother's compliance with mental health treatment, the trial court stated in its findings of fact that Mother had "testified without contradiction that she was currently attending outpatient treatment at Peninsula for monthly medication monitoring" with a case manager. However, the trial court also noted that Mother had testified that she did not believe she really had a history of mental illness or that she needed the medication. During trial, Mother stated that she attends her outpatient treatment at Peninsula monthly but that she "doesn't really see that [she] needs to." Acknowledging that she was currently taking a prescription to treat bipolar disorder, Mother also insisted that she did not need it and stated: "You all are forcing me . . . I am doing my part in compliance for my children."

Contrary to Mother's argument, the trial court clearly considered Mother's cooperation with her Peninsula case manager in taking her medication at the time of trial. However, the court found that when coupled with her "anger issues," Mother's "failure to understand the severity of her mental health issues as shown by her belief that she does not need her prescribed medication and is only taking them because the Court has indicated it is necessary for her to get what she wants, establish that she is unfit to care for her children." The evidence does not preponderate against this finding. Moreover, we determine that the trial court properly considered Mother's situation at the time of trial as well as the record as a whole. *See generally In re K.A.P.*, No. W2012-00281-COA-R3-JV, 2013 WL 6665012, at *6 (Tenn. Ct. App. Dec. 17, 2013) ("Tennessee Code Annotated § 37-1-159 directs the circuit court to conduct its own *de* novo trial, but also permits it to consider the juvenile court record.").

Second, Mother asserts that the trial court improperly "relied heavily on the fact that the Mother was the victim of an assault in December of 2019." We disagree with this characterization of the trial court's findings concerning the December 2019 incident.[8] The trial court noted in its factual findings that Mother acknowledged during trial that she admitted the perpetrator of the assault against her into her home and subsequently into her vehicle "[d]espite only knowing him for three days, having asked him not to just drop by, and despite her observation that he was intoxicated." In reviewing the trial court's findings, we determine that the court primarily questioned Mother's judgment, which during this incident led her to be alone in her home and vehicle with an intoxicated man she did not know and to become lost on an unfamiliar road late at night. The trial court specifically found that Mother's "failure to exercise appropriate judgment by allowing an intoxicated man whom she had only know[n] three days into her apartment and then agreeing to give him a ride" supported a finding of dependency and neglect under what is now Tennessee Code Annotated § 37-1-102(13)(F), concerning a parent's or guardian's "improper guardianship or control as to injure or endanger the morals or health" of a child. We agree with the trial court on this point.

In support of her position regarding the December 2019 incident, Mother relies on this Court's decision in *In re K.A.P.*, 2013 WL 6665012, to argue that because the Children were not with her when she admitted the man into her home and vehicle, the incident does not indicate that her actions could potentially have endangered the Children. We find *K.A.P.* to be highly factually distinguishable. This Court reversed the circuit court's finding of dependency and neglect against the mother in *K.A.P.*, concluding that the finding that the mother had "at some point in the past engaged in once-per-week marijuana use and had a single positive drug test in September 2011, without more, [did] not amount to clear and convincing evidence that Mother [was] 'unfit to properly care for [Son]' or that Son [was] dependent and neglected under any subsection" of the statutory definition. *In re K.A.P.*, 2013 WL 6665012, at *8. In this case, Mother relies on the *K.A.P.* Court's statement that it could not discern from the circuit court's factual findings "whether Mother's marijuana usage occurred when Son was physically present with Mother[.]" *Id.* at *7.

---

[8] In support of her assertion that the trial court erred in its conclusion regarding the December 2019 assault, Mother cites a New York federal district court case and state cases outside of Tennessee for the proposition that Mother phrases as "separating a Mother from her children solely on the basis that the Mother was a victim of domestic violence is an unconstitutional practice." We note that these authorities are not controlling for this Court, although they may be persuasive authorities. *See Leggett v. Duke Energy Corp.*, 308 S.W.3d 843, 871 (Tenn. 2010); *see, e.g.*, *Riggs v. Burson*, 941 S.W.2d 44, 51 (Tenn. 1997). Moreover, having determined that the trial court in this action did not base its findings on Mother's having been a victim of a domestic assault, we decline to address Mother's proposition in this regard.

- 17 -

However, much more could not be discerned from the circuit court's factual findings in *K.A.P.*, including on which subsection of the statutory definition the court had relied when it reached the sole conclusion that the child was dependent and neglected "'due to [Mother] having a drug test that was positive for marijuana and [Mother] admitting that she had used marijuana when [Son] was in her legal custody.'" *Id.* In contrast to the circuit court in *K.A.P.*, the trial court in the instant action made factual findings as to Mother's judgment during the December 2019 incident along with many other factual findings concerning her actions, and the court specifically noted the statutory subsection under which it found Mother's lack of good judgment concerning her own safety to be potentially harmful to the Children as well if they were returned to her custody. The evidence does not preponderate against the trial court's findings in this regard.

Third, Mother asserts that the trial court improperly "[made] much of the Mother's general skepticism of the medical profession," arguing that "basing a finding of dependence and neglect on the Mother's unorthodox belief system as the trial court has done in the case at bar is constitutionally suspect." Upon careful review, we determine that Mother has mischaracterized this aspect of the trial court's judgment as well. Grandmother's testimony demonstrated that each of the Children had medical needs that needed to be closely monitored. She reported that Crystal has been diagnosed with "defiance disorder" and that Jennifer was "learning delayed." According to Grandmother, both Crystal and Jennifer had been diagnosed with attention deficit hyperactivity disorder, for which they had each been prescribed medication. In addition, Grandmother relayed that Jennifer had a heart murmur, requiring regular check-ups with a cardiologist, and hereditary scoliosis, requiring a back brace. When questioned regarding Grandparents' ability to take the Children to their medical appointments, Grandmother testified that the Children had never missed an appointment while in Grandparents' custody. She also expressed willingness to have the Children begin counseling therapy again, stating that they had ended therapy previously only upon being released by the therapist after two years of counseling. In contrast, Mother acknowledged that she was not aware of the Children's current health or educational needs, stating that this was because "they don't tell me anything," and as the trial court found, Mother repeatedly expressed her mistrust of the medical profession throughout her testimony. Mother did not, however, articulate a particular "belief system" underlying this mistrust.

Additionally, DCS counters Mother's assertion concerning an "unorthodox belief system" by stating that the authorities on which Mother relies do not support her proposition. We agree. For example, in *Wisconsin v. Yoder*, the United States Supreme Court held that in resisting a state compulsory school attendance law for their children, the respondents, Amish parents, had met the high bar of

convincingly demonstrat[ing] the sincerity of their religious beliefs, the interrelationship of belief with their mode of life, the vital role that belief and daily conduct play in the continued survival of Old Order Amish communities and their religious organization, and the hazards presented by the State's enforcement of a statute generally valid as to others.

406 U.S. 205, 235 (1972). However, the High Court simultaneously noted that "the power of the parent, even when linked to a free exercise claim, may be subject to limitation under Prince if it appears that parental decisions will jeopardize the health or safety of the child, or have a potential for significant social burdens." *Id.* at 233-34 (citing *Prince v. Mass.*, 321 U.S. 158 (1944)).

Finally, we conclude that the evidence supports the trial court's findings that Mother's long history of mental health issues, coupled with her history of "altercations with people whom she believes are challenging her or giving her a difficult time" support a determination that Mother was unfit to properly care for the Children at the time of trial. Upon a thorough review of the record, we determine that the evidence preponderates in favor of the trial court's finding, by clear and convincing evidence, that the Children were dependent and neglected as to Mother at the time of the *de novo* trial pursuant to what is now codified as Tennessee Code Annotated § 37-1-102(b)(13)(B), (D), (F), and (G).

## V.  Conclusion

For the foregoing reasons, we affirm the judgment of the trial court. We remand this case for enforcement of the judgment and collection of costs below. Costs on appeal are taxed to the appellant, Wanda P.

_____
THOMAS R. FRIERSON, II, JUDGE

- 19 -